T.C. Memo. 2015-131

UNITED STATES TAX COURT

CHRISTOPHER HOLDEN AND KAREN A. HOLDEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14915-11.                      Filed July 16, 2015.

    In 2007 P-H operated a medical practice through his wholly owned
S corporation (S).  On its 2007 Federal income tax return S reported
income and claimed deductions for various expenses.  S reported a
net loss for the year, which flowed through to Ps' 2007 tax return.  R
contends that Ps received but failed to report additional income from
S's business and that Ps failed to substantiate many of the expenses
underlying S's claimed deductions.

    <u>Held</u>: Ps established by a preponderance of the evidence that some
of the alleged unreported income consisted of nontaxable loan
proceeds, but the balance constitutes taxable income.

    <u>Held</u>, <u>further</u>, Ps adequately substantiated some, but not all, of the
expenses for which S claimed deductions.  R properly disallowed
deductions for the expenses that Ps have not adequately substantiated.

    <u>Held</u>, <u>further</u>, Ps are liable for the I.R.C. sec. 6662(a) accuracy-
related penalty.

**[*2]**   <u>Walter D. Channels</u>, for petitioners.

<u>Jenny R. Casey</u> and <u>David J. Warner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  Respondent determined a $254,951 deficiency in petitioners' 2007[1] Federal income tax and a $50,990 section 6662(a) accuracy-related penalty.[2]  After the filing of a stipulation of facts, second stipulation of facts, and stipulation of settled issues,[3] the facts of which are agreed to by the

---

[1]Concurrently with our consideration of Dr. Holden's 2007 tax year, his 2008 and 2009 tax years were before another Judge of this Court, who issued an opinion as to those tax years in <u>Holden v. Commissioner</u>, T.C. Memo. 2015-83. The two cases feature some common characters and issues, but they were tried separately and have distinct evidentiary records.  We apply the law and render our opinion on the basis of the testimony and documentary evidence in the record of <u>this</u> case.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the tax year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all amounts to the nearest dollar.

[3]In the stipulation of settled issues:  (1) respondent conceded that petitioners were entitled to deduct a $135,804 net operating loss carryforward; (2) petitioners conceded that they received but failed to report a $1,686 taxable refund of California income tax; and (3) petitioners conceded respondent's elimination of the income and expenses they had reported on Schedule C, Profit or Loss From Business, as well as respondent's transfer of the amounts of those original items to
(continued...)

**[*3]** parties and incorporated herein by this reference, the issues remaining for decision are:

(1) whether petitioners received, but failed to report, $171,177 of taxable income from Christopher Holden's wholly owned S corporation, Christopher Holden MD, Inc. (CHMD), for 2007;

(2) whether, and if so to what extent, petitioners may deduct $387,442 of passthrough loss from CHMD, comprising the following expenses allegedly paid by CHMD during 2007: $111,138 of salaries and/or wages, $80,300 of equipment rental expenses, $80,099 of interest expenses, $41,122 of depreciation, $11,613 of supplies expenses, $36,258 of office expenses, $6,401 of dues and subscriptions expenses, $9,970 of contract labor expenses, and $10,541 of auto and truck expenses; and

---

[3](...continued) Christopher Holden MD, Inc.'s Form 1120S, U.S. Income Tax Return for an S Corporation, and ultimately to petitioners' Schedule E, Supplemental Income and Loss. In the stipulation of facts, respondent conceded some or all of the disallowed deductions for various categories of reported expenses, thus narrowing the deduction amounts at issue here. Notwithstanding petitioners' concession concerning their California income tax refund in the stipulation of settled issues, respondent conceded this issue in his opening brief. In his answering brief respondent avers that the parties will reconcile their contrary concessions in the Rule 155 computation.

**[\*4]** (3) whether petitioners are liable for the section 6662(a) accuracy-related penalty.

## FINDINGS OF FACT[4]

Petitioners Christopher and Karen Holden lived in California when they filed their petition. They filed a joint Federal income tax return for 2007 but were divorced in August of that year. Christopher Holden is a doctor with a family practice specializing in geriatric medicine. Karen Holden teaches high school.

### I. CHMD

During 2007 Dr. Holden operated his medical practice entirely through his wholly owned S corporation, CHMD. At the beginning of 2007 CHMD had two offices, one in Orange, California (Orange office), and the other in Anaheim, California (Anaheim office). The Orange office predated the Anaheim office, which opened in 2004. In addition to seeing patients at these two offices, Dr. Holden typically spent his mornings visiting nonambulatory patients at board and care facilities, skilled nursing facilities, assisted living facilities, and Chapman Hospital. He sometimes returned to these rounds in the late afternoon or early

---

[4]The Court created several schedules summarizing and synthesizing evidence in the record to aid its analysis of that evidence. We have attached those schedules as appendices to this opinion.

[*5] evening after seeing patients at his offices. In 2007 Dr. Holden had no business activities or material source of income other than his medical practice.

A. Office Staff

At the beginning of 2007 CHMD employed about 25 people, some of whom were independent contractors.

John Rhondo, who has worked as a business consultant since 1988, primarily for medical practices, served as CHMD's practice manager during 2007. In that capacity, he oversaw the practice and sought to improve its profitability and efficiency.

Jane Garcia provided management services to CHMD as an independent contractor from February 2004 through approximately August 2009. When providing services to CHMD she generally shared an office with Dr. Holden at CHMD's Orange office. Ms. Garcia's duties consisted of paying bills, managing the two offices and their staffs, and maintaining CHMD's books using Quickbooks software. Because Ms. Garcia often drove back and forth between the two offices and also to other locations for projects necessary for the business, as part of her fee compensation Dr. Holden sometimes wrote separate checks to her in the amount of her monthly car payments.

**[\*6]**  Drs. Depinder Mann and Edward M. Andujar, each of whom also had his or her own separate medical corporation, worked for CHMD as contractors and saw patients at its Anaheim office.  Nurse practitioner Donna Do and office manager Ninpapha Niangnouansy also worked at the Anaheim office.  Jennifer M. Rivera worked as a medical assistant at the Orange office.  During 2007 CHMD made payments to Drs. Mann and Andujar, Ms. Do, Ms. Niangnouansy, and Ms. Rivera as compensation for their services.

B.    Office Administration

CHMD relied on a payroll processing company, Automatic Data Processing (ADP), to prepare its payroll checks.  For each pay period, Ms. Garcia would telephone ADP to report the hours worked by each employee and independent contractor on CHMD's payroll.  ADP would then prepare and deliver the payroll checks to CHMD, to be signed by either Dr. Holden or Ms. Garcia and then disbursed to the staff.

Ms. Garcia kept CHMD's books.  She entered bills into Quickbooks as payables upon receipt, updated the entries to reflect payment when she wrote checks or made online payments, and maintained hard copy records with annotations in vendor-specific folders.  Ms. Garcia classified CHMD's expenses within various available Quickbooks categories.  An unrelated company would

**[*7]** review CHMD's books quarterly and would sometimes suggest that certain expenses be reclassified. Ms. Garcia would discuss these suggestions with Dr. Holden and make adjustments if appropriate.

CHMD maintained only one bank account during 2007, a checking account at Bank of America (BofA account). Dr. Holden maintained a separate, personal account at Cal National USBank. Ms. Garcia and Dr. Holden were both signers on the BofA account, and Ms. Garcia sometimes paid bills from the account through an online billpay feature rather than by writing out checks. Also during 2007, CHMD maintained or established business credit card accounts with Advanta Bank Corp. (Advanta), American Express, and Platinum Plus.

C.   Office Equipment

During 2007, in addition to medical care CHMD provided cosmetology services. These services, which included injections, laser therapies for skin blemishes and cancer biopsies, and a skin-tightening treatment known as Thermage, required specialized equipment. CHMD leased most of the equipment in the Anaheim office, including the Thermage machine, aculight laser, hyperbaric chamber, infrared sauna, and puroflow. CHMD had purchased other equipment in the Anaheim office, including the X-ray machine. Similarly, CHMD had purchased the X-ray machine at the Orange office and owned its scales,

[*8] stethoscopes, echoscopes, autoclave for sterilization, and surgical instruments. CHMD also leased nonmedical equipment, such as its copy machines and the equipment associated with its security system.

CHMD leased its rented equipment from a variety of vendors. These vendors included LFG, MBF Leasing, HPSC, IFC Credit Corp., Great America, Banc of America Leasing, Compare Business Systems, Inc., Protection One, and GE Healthcare Financial Services (GE).[5] These companies billed CHMD, usually monthly, and Ms. Garcia paid the bills on their stated due dates. When she received bills from leasing companies, Ms. Garcia would enter them in Quickbooks.

On or about December 29, 2006, CHMD and two lessors, Key Equipment Finance, Inc. (Key), and Marlin Leasing (Marlin), entered into agreements labeled as leases (purported leases). The purported leases covered identical sets of equipment, including computer and printer servers, software, equipment for a local area network, and laptop computers. Each purported lease identified the "vendor" for these items as MedSoft Solutions, Inc. (Medsoft). Marlin purchased from

---

[5]Great America is alternately identified on canceled checks, bank statements, and CHMD's profit and loss statement (P&L) as "Great America", "Great America Leasing", "Great America Leasing Corp", "Greatamerica Leasing Corp", and "Great American Leasing Corp." Similarly, Banc of America Leasing sometimes appears as "Bank of America".

**[*9]** MedSoft the items covered by its purported lease at CHMD's request. CHMD used the equipment acquired from Key at its Orange office and the equipment acquired from Marlin at its Anaheim office. Each purported lease provided for an initial, lump-sum payment followed by 60 equal monthly payments. The Marlin agreement was, by its terms, irrevocable, and the agreement with Key unconditionally mandated that CHMD pay all amounts due thereunder.

Pursuant to the purported leases CHMD made the following payments, each consisting of a base lease charge and in some instances taxes and fees, to Marlin and Key:[6]

---

[6]Petitioners obtained the purported lease with Marlin and related documents from Marlin via subpoena. The documents include a "Payment History Report" that reflects receipt of payments from CHMD during 2007 and indicates that the check amounts included various taxes and fees in addition to the base monthly charge. Ms. Garcia recorded interest and finance charges associated with expenses under separate Quickbooks categories, and CHMD's P&L reflects that she recorded taxes and other fees paid to Marlin Leasing under separate Quickbooks categories. We have omitted payments for which the report indicates CHMD's checks were returned as unpayable.

The purported lease with Key specifies monthly payments of $1,378, and we have identified 10 payments in this amount, one in each month other than February, on CHMD's bank statements. For most of the payments, the statements simply list a check number, but in two instances, they identify Key as the payee.

[*10]

| Pay date | Payment form | Total payment | Amount allocable to base lease charge | Payee |
|---|---|---|---|---|
| 1/2/2007 | Cash | $2,861 | $2,586 | Marlin |
| 1/2/2007 | Direct debit | 2881 | 2,881 | Key[1] |
| 2/15/2007 | Check 2184 | 1,417 | 1,293 | Marlin |
| 3/12/2007 | Check 2256 | 1,587 | 1,293 | Marlin |
| 3/12/2007 | Check 2249 | 1,378 | 1,378 | Key |
| 4/9/2007 | Check 2322 | 1,378 | 1,378 | Key |
| 4/10/2007 | Direct debit | 1,393 | 1,293 | Marlin |
| 5/4/2007 | Direct debit | 1,378 | 1,378 | Key |
| 5/16/2007 | Check 8667 | 1,393 | 1,293 | Marlin |
| 6/7/2007 | Direct debit | 1,378 | 1,378 | Key |
| 6/14/2007 | Check 8861 | 1,705 | 1,293 | Marlin |
| 7/3/2007 | Check 8836 | 1,378 | 1,378 | Key |
| 7/16/2007 | Check 8668 | 1,393 | 1,293 | Marlin |
| 8/2/2007 | Check 8921 | 1,378 | 1,378 | Key |
| 8/20/2007 | Check 8991 | 1,452 | 1,293 | Marlin |
| 9/4/2007 | Check 8922 | 1,378 | 1,378 | Key |
| 9/13/2007 | Check 8990 | 1,452 | 1,293 | Marlin |
| 10/9/2007 | Check 8986 | 1,378 | 1,378 | Key |
| 11/5/2007 | Check 2545 | 1,378 | 1,378 | Key |
| 11/9/2007 | Check 2554 | 1,646 | 1,293 | Marlin |
| 12/5/2007 | Check 2619 | 3,128 | 2,585 | Marlin |

**[\*11]**  12/5/2007  Check 2627       1,378       1,378      Key

<sup>1</sup>CHMD's bank statements identify the payee of some direct debit payments to Key as "Leasing Services DES".

Under the agreement with Marlin, unless CHMD exercised its purchase option, it was obliged to maintain the equipment "in good operating order" and to return the equipment at the end of the lease term "in good working condition", and it would be liable to Marlin for any damage "beyond ordinary wear and tear."  The agreement also required CHMD to pay any and all taxes due on the equipment, to insure it, and to bear all repair and maintenance costs for it.  In addition, the agreement expressly reserved all tax benefits associated with the equipment to Marlin unless CHMD received, at the outset, an option to purchase the equipment at the end of the term for $1.  The agreement did grant CHMD the option to buy at term-end, but for $101 rather than $1.  The Marlin agreement expressly stated that it was a "TRUE LEASE" and not a "CONDITIONAL SALE".

The agreement with Key obliged CHMD to purchase the equipment at the end of the lease term for $1.  During the term, CHMD was required to pay any and all taxes due on the equipment and to insure it.  The Key agreement further recited that the parties intended it to be "a true lease or a time-sale of goods (for which a cash price was offered to Lessee)".

[*12] CHMD's certified public accountant, Ashley Hallsman, who as of 2007 had prepared CHMD's tax returns for at least five years, determined which equipment items would be depreciated without guidance from or consultation with Dr. Holden.

D.    Office Finances

CHMD earned income from the medical and cosmetology services it provided to patients, many of whom were covered by health insurance from which CHMD would receive postappointment payment. As of 2007 CHMD received most of its income from one insurance provider, Medicare.

In or around October 2004 Medicare had ceased making payments to Dr. Holden because of a dispute. Dr. Holden and Medicare ultimately resolved the dispute, and Medicare released funds owed to Dr. Holden in December 2005. In April 2006 Medicare suspended payments to CHMD, resuming only after several months. For at least some portion of 2007 Medicare made no payments to CHMD. During this time, CHMD's expenses remained constant, but its receipts declined by roughly half.

After its Medicare payments halted, CHMD struggled to meet its expenses and payroll and so sought to borrow from all available sources. At Dr. Holden's direction, Ms. Garcia obtained loans for CHMD from loan companies and credit

[*13] card companies at interest rates up to approximately 40%. Mr. Rhondo introduced Ms. Garcia to Peter Lee, a financial expert who specialized in finding financing from banks, mortgage companies, and leasing companies, as well as hard money. Medware Group, Inc. (Medware), which specialized in medical software, hardware, and leasing, was among the companies from which CHMD obtained funds during this period of financial difficulty. As part of her management duties, Ms. Garcia completed application paperwork for a loan from Medware on CHMD's behalf. CHMD provided no services and sold no products to Medware during 2007.

CHMD received 16 payments totaling $144,258 from Medware during 2007 (Medware advances):

| Check No. | Check date | Amount | Deposit date | Post date |
|---|---|---|---|---|
| 1509 | 1/12/2007 | $9,900 | 1/12/2007 | 1/12/2007 |
| 1510 | 1/12/2007 | 9,700 | 1/12/2007 | 1/12/2007 |
| 1511 | 1/12/2007 | 9,800 | 1/12/2007 | 1/12/2007 |
| 1512 | 1/12/2007 | 9,500 | 1/12/2007 | 1/12/2007 |
| 1513 | 1/12/2007 | 9,900 | 1/12/2007 | 1/12/2007 |
| 1514 | 1/12/2007 | 9,800 | 1/12/2007 | 1/12/2007 |
| 1515 | 1/12/2007 | 9,700 | 1/16/2007 | 1/16/2007 |
| 1516 | 1/12/2007 | 9,900 | 1/16/2007 | 1/16/2007 |

| 1517 | 1/12/2007 | 9,500 | 1/16/2007 | 1/16/2007 |
| 1518 | 1/12/2007 | 6,558 | 1/16/2007 | 1/16/2007 |
| 1670 | 5/18/2007 | 2,913 | 5/21/2007 | 5/21/2007 |
| 1697 | 6/5/2007 | 9,832 | 6/6/2007 | 6/6/2007 |
| 1698 | 6/5/2007 | 9,679 | 6/6/2007 | 6/6/2007 |
| 1699 | 6/5/2007 | 9,978 | 6/7/2007 | 6/7/2007 |
| 1700 | 6/5/2007 | 9,988 | 6/7/2007 | 6/7/2007 |
| 1701 | 6/5/2007 | 7,610 | 6/8/2007 | 6/8/2007 |

The payee on each of these checks was "Christopher Holden". Medware required no collateral, and CHMD made no principal or interest payments to Medware. Medware went out of business at some point after 2007.[7]

---

[7]According to the online records of the California secretary of state, Medware Group, Inc., was incorporated as a California corporation on August 25, 2005, and at some point before the date of this opinion, its corporate powers were suspended by the Franchise Tax Board, California's income tax agency. We take judicial notice of these adjudicative facts pursuant to Fed. R. Evid. 201(b). See Sears v. Magnolia Plumbing, Inc., 778 F. Supp. 2d 80, 84 n.6 (D.D.C. 2011) (taking judicial notice of corporate resolutions available through the Maryland Department of Assessments and Taxation's Web site); Grant v. Aurora Loan Servs., Inc., 736 F. Supp. 2d 1257, 1265 (C.D. Cal. 2010) (taking judicial notice of, inter alia, the Delaware secretary of state's certificate of authentication for a certificate of incorporation and a certificate of conversion from a corporation to an LLC); Lengerich v. Columbia Coll., 633 F. Supp. 2d 599, 607 n.2 (N.D. Ill. 2009) (taking judicial notice of a corporation filing for Columbia College Chicago on the Illinois secretary of state's Web site).

[*15] Ms. Garcia also lent money to CHMD on several occasions. To facilitate Dr. Holden's acquisition of the Anaheim office, she lent him $100,000, at least $50,000 of which was delivered in April 2004. In December 2004 she delivered another $20,000. On April 2, 2007, Ms. Garcia lent CHMD $3,985 to cover medication and practice expenses, and she lent another $9,000 on April 16. Ms. Garcia did not charge interest on her April 2007 loans, which were repaid over the course of 2007, but she did charge interest on the loans she made in 2004.

CHMD paid interest to various lenders, credit card companies, and leasing companies during 2007. In some cases, Ms. Garcia wrote checks to cover interest only, with no payment toward principal.

CHMD closed its Anaheim office in July 2007 because of its financial difficulties. On August 27, 2009, Dr. Holden filed for personal bankruptcy. Mr. Rhondo assisted Dr. Holden in preparing the paperwork for his bankruptcy filing. The creditors schedule Dr. Holden filed with the bankruptcy court does not list Medware among Dr. Holden's creditors.

E.    Office Floods

From 2001 through the time of trial, CHMD rented its Orange office from TCI Properties, Inc. (TCI), a property management company owned by William Griffith, who also owns the building in which the Orange office is located. The

[*16] Orange office experienced water leaks on several occasions during that time, including in 2007 and 2009.

On or around September 29, 2007, a pipe burst after heavy rains, causing severe damage that took a year to fully repair. CHMD hired Leonel Miguez, a construction contractor, to repair damaged drywall and flooring. Mr. Miguez brought in Francisco Alatriste, an electrician, to perform electrical work related to the repairs. CHMD made various payments totaling $7,180 to one or the other of these men in December 2007. TCI, the landlord, also engaged contractor B&B General Construction Services, Inc. (B&B), to perform work at the premises after the 2007 flood.

Two years later, on or around December 13, 2009, heavy rains again caused a pipe to break at the Orange office over a weekend. Unlike the 2007 flood, the 2009 leak affected the area of the Orange office where medical records, computers, billing records, records of CHMD's debts, Dr. Holden's books, and Dr. Holden's and Ms. Garcia's desks were located. Because, following the creditors meeting, Dr. Holden's bankruptcy trustee had asked to review five years' worth of documentation related to CHMD's business, Mr. Rhondo had gathered all of the relevant documents and hard drives and placed them in a designated area against a wall of Dr. Holden's office in or around October or November 2009 and before the

[*17] December 2009 flood.  In an unfortunate twist of fate, the pipe broke directly above these records, drenching and thus mostly destroying them.  CHMD's regular cleaning crew bagged up the sodden paperwork and carried it out of the building.

After both the 2007 and 2009 floods, CHMD filed claims with its property insurer.  It received $11,728 in 2007 and $350 in 2009 under its policy.  CHMD included the $11,728 received in 2007 as income on its Form 1120S.

## II.     Tax Returns and Audit

Petitioners filed a joint Form 1040, U.S. Individual Income Tax Return, for the 2007 taxable year.  They reported income from CHMD on Schedules C and E, but the parties have stipulated that petitioners should have reported this income only on Schedule E.  On Schedule C they reported gross income of $344,532 and total expenses of $344,483.  On Schedule E they reported a $29,479 net nonpassive loss from CHMD.

CHMD filed Form 1120S for the 2007 taxable year.  It reported $923,014 of total income and claimed $952,493 of total deductions, for a net loss of $29,479.  CHMD claimed deductions for, inter alia, the following expenses:

**[*18]**

| Expense | Amount |
|---|---|
| Salaries and wages | $280,774 |
| Rents | 178,762 |
| Interest | 80,099 |
| Depreciation | 41,122 |
| Other deductions | |
| Supplies | 122,144 |
| Office | 37,270 |
| Dues and subscriptions | 11,973 |
| Contract labor | 24,744 |
| Auto and truck | 10,541 |

Although CHMD's Quickbooks file was maintained on the accrual method of accounting, it reported its income for tax purposes in accordance with the cash method of accounting.

Respondent assigned Revenue Agent Beth Stroud (RA Stroud) to examine CHMD's return. In the course of her examination, RA Stroud never gained access to CHMD's books and records. She conducted a bank deposits analysis of CHMD's BofA account and determined that $1,316,827 had been deposited into that account during 2007. From this amount, she debited $227,147 of nontaxable deposits. Respondent also determined that $4,510 of deposits into Dr. Holden's personal bank account were taxable income of CHMD. From these numbers,

**[*19]** respondent computed CHMD's total 2007 income as $1,094,191, or $171,177 more than CHMD reported on its return.

On March 28, 2011, respondent mailed petitioners a notice of deficiency for the 2007 taxable year determining a deficiency in tax of $254,951 and a section 6662(a) accuracy-related penalty of $50,990. As is relevant here, that determination rested upon a positive adjustment of $813,309 to petitioners' reported passthrough loss from CHMD, made on the basis of RA Stroud's examination. That adjustment arose, in turn, from RA Stroud's increase of CHMD's gross receipts or sales and her disallowance of nearly all of CHMD's claimed deductions for interest, depreciation, and other business expenses. Petitioners timely petitioned this Court for redetermination of the deficiency and penalty on June 23, 2011. Their case was tried on December 13, 2013.

OPINION

The Commissioner's determination of a taxpayer's tax liability is generally presumed correct, and the taxpayer bears the burden of proving the determination improper. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). This rule generally governs the nonpenalty issues in this case.

**[*20]** I.    Unreported Income

Respondent contends that CHMD received but failed to report income of $171,177 for the 2007 tax year.[8]  In their answering brief petitioners concede that they failed to report $4,510 of deposits into Dr. Holden's personal bank account that should have been deposited into CHMD's BofA account, reducing the amount at issue to $166,667.[9]  Petitioners contend that, of that amount, $144,258 consisted of nontaxable loans from Medware and $12,985 consisted of nontaxable loans from Ms. Garcia.  They make no argument and presented no evidence concerning the $9,424 balance, so we will treat this amount as conceded.  Thus, the parties dispute whether CHMD received but failed to report $157,243 of income for 2007.

Because of the difficulty inherent in proving a negative, where the Commissioner determines that a taxpayer received unreported income, he "must

---

[8]On brief respondent computes this amount as $182,905.  This computation ignores CHMD's reporting of $11,728 of other income on its Form 1120S and contradicts paragraphs 15 and 24 of the parties' stipulation of facts.  We will rely on the stipulated numbers absent obvious computation errors.

[9]Also in their answering brief petitioners contend that their conceded receipt of a $1,686 State income tax refund should be set off against the amount of unreported income in dispute.  The notice of deficiency, however, makes clear that respondent determined this $1,686 increase to petitioners' income separately from his determination of a $813,309 increase in their income attributable to his adjustment of CHMD's return.  The State income tax refund and CHMD's net income are separate issues, and petitioners' concession as to the former will not affect the latter.

[*21] offer some substantive evidence showing that the taxpayer received income from the charged activity" before he may rely upon the presumption of correctness. Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir. 1979), rev'g 67 T.C. 672 (1977).[10]  If the Commissioner provides a "minimal factual foundation" for his determination, the burden of proof shifts to the taxpayer.  Palmer v. United States, 116 F.3d 1309, 1312 (9th Cir. 1997); accord Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989).  At this second stage, the taxpayer must endeavor to rebut the presumption in favor of the Commissioner's determination "by establishing by a preponderance of the evidence that the deficiency determination is arbitrary or erroneous."  Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985).

A.    Respondent's Evidentiary Foundation

The Commissioner may employ any reasonable method to reconstruct a taxpayer's income and thereby lay the requisite evidentiary foundation.  See Petzoldt v. Commissioner, 92 T.C. at 693; see also Palmer, 116 F.3d at 1312 (method need only be "rationally based").  For example, "[t]he use of the bank

_____

[10]This Court "follow[s] a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).  When they filed their petition, petitioners lived in California, a State within the jurisdiction of the Court of Appeals for the Ninth Circuit, so we will follow decisions of that court.  See sec. 7482(b)(1)(A).

[*22] deposit method for computing unreported income has long been sanctioned by the courts." Clayton v. Commissioner, 102 T.C. 632, 645 (1994); see also Weimerskirch v. Commissioner, 596 F.2d at 362 (listing the taxpayer's bank deposits as one means by which the Commissioner could have attempted to substantiate the charge of unreported income). The method "assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income". Clayton v. Commissioner, 102 T.C. at 645. Although the Commissioner must "take into account any nontaxable source or deductible expense of which * * * [he] has knowledge", "[b]ank deposits are prima facie evidence of income". Id. at 645-646.

RA Stroud employed the bank deposits method to reconstruct CHMD's 2007 income. She computed total deposits into the BofA account and, to the extent of her knowledge, eliminated all nontaxable deposits. She followed the procedure we sanctioned in Clayton, and petitioners do not dispute her computations. As petitioners do not contend otherwise, we therefore conclude that respondent has established a minimal evidentiary foundation for his determination of unreported income. See Weimerskirch v. Commissioner, 596 F.2d at 361.

**[\*23] B.    Petitioners' Evidentiary Riposte**

Petitioners offered evidence concerning two groups of allegedly nontaxable deposits:  $144,258 received from Medware and $12,985 received from Ms. Garcia.  Respondent has not disputed that during 2007 CHMD underwent serious financial difficulties, that Dr. Holden sought financing from multiple sources to keep the business afloat, or that CHMD received and deposited into its BofA account $144,258 from Medware.  At issue is whether the Medware advances represent taxable income or the proceeds of a nontaxable loan.  As for the funds from Ms. Garcia, respondent introduced the evidence of these advances but on brief objects that supporting facts are not in evidence.  We analyze the two sets of alleged loans separately.

### 1.    Medware

For tax purposes, a loan is "'an agreement, either expressed or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree.'"  Commissioner v. Valley Morris Plan, 305 F.2d 610, 618 (9th Cir. 1962) (quoting Nat'l Bank of Paulding v. Fid. & Cas. Co., 131 F. Supp. 121, 123-124 (S.D. Ohio 1954)), rev'g 33 T.C. 572 (1959), and rev'g Morris Plan Co. of

[*24] Cal. v. Commissioner, 33 T.C. 720 (1960).  Whether an advance constitutes a loan is a question of fact.  Fisher v. Commissioner, 54 T.C. 905, 909 (1970).

In determining whether a payment constitutes a loan, "we examine the transaction as a whole."  Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C. Memo. 1998-121, 75 T.C.M. (CCH) 2065 (1998).

> The conventional test is to ask whether, when the funds were advanced, the parties actually intended repayment.  * * *
>
> However, courts have considered a number of other factors as relevant in assessing whether a transaction is a true loan, such as:  (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan * * *; and (7) whether the parties conducted themselves as if the transaction were a loan." * * * [Id.]

 "No one factor is necessarily determinative, and the factors considered do not constitute an exclusive list."  Calloway v. Commissioner, 135 T.C. 26, 37 (2010), aff'd, 691 F.3d 1315 (11th Cir. 2012).

We may quickly dispose of three of these factors.  The record contains no evidence that:  (1) CHMD and Medware ever executed any written instrument embodying a loan agreement; (2) Medware imposed an interest charge, deferred or otherwise, on its advances to CHMD; or (3) CHMD and Medware established any

[*25] fixed repayment schedule. We recognize that loan documents between CHMD and Medware, if they existed, may have been destroyed in the 2007 or the 2009 flood at the Orange office. But a loss of original records due to circumstances beyond a taxpayer's control merely entitles the taxpayer to establish facts with other credible evidence; it does not shift the burden or proof, which remains with the taxpayer. See Malinowski v. Commissioner, 71 T.C. 1120, 1124-1125 (1979). Petitioners failed to carry that burden with respect to these three factors, so they weigh against finding a loan.

Although the record does contain evidence relevant to the next two factors, neither weighs in petitioners' favor: (4) Medware required no collateral, and (5) CHMD never made any principal, interest, or other payments to Medware.

Continuing with the sixth factor, when Medware advanced funds to CHMD, CHMD was in dire financial straits, but its situation was not hopeless. Medware wrote 10 checks to CHMD totaling $94,258 on January 12, 2007. At that time, payments from CHMD's principal source of income, Medicare, had been frozen for several months. Yet, Medicare had once before stopped payments and then resumed them. Moreover, Dr. Holden's bankruptcy schedule reveals that Chase issued him a credit card in January 2007, evidence that an arm's-length lender did not consider him wholly uncreditworthy at that time. CHMD received additional

[*26] funds from Medware in May and June 2007. It is unclear from the record whether these funds were disbursed pursuant to the same loan arrangement as the funds disbursed in January. Nevertheless, soon after receiving them, in July 2007, CHMD closed its Anaheim office. Given that the Orange office had been profitable, closure of the Anaheim office enhanced the prospect of a turnaround. Further bolstering this prospect, Medicare had resumed its payments to CHMD in the first half of 2007. We conclude that the sixth factor weighs slightly in favor of finding a loan.

The seventh factor, the parties' conduct with respect to the advances, is ambiguous. On one hand, Medware, the purported lender, required CHMD to complete a loan application, a formality consistent with commercial lending practices. On the other hand, Medware disbursed an irregular amount of funds in irregular tranches at irregular intervals, which was not consistent with conventional lending practices. Oddly, of the 16 Medware checks totaling $144,258 that CHMD deposited during 2007, none had a face value greater than $10,000, and several had face values just below that amount. As for CHMD, Ms. Garcia testified generally that she entered loans on CHMD's books as loans and that she had entered the Medware advances on CHMD's general ledger. The advances do not appear in the income section of CHMD's P&L, but petitioners did not introduce its general

**[\*27]** ledger or balance sheet. We thus cannot verify whether, and if so, how, CHMD recorded the advances from Medware on its books. We do know, however, that Dr. Holden did not list Medware as a creditor in his bankruptcy schedules filed in 2009.

In sum, five factors weigh against finding a loan, one weighs in favor, and one is ambiguous. These factors are simply analytical aids, not essential elements. See Welch v. Commissioner, 204 F.3d at 1230. The ultimate question, which is a factual one, is whether the parties intended a loan when the funds were advanced.[11] See id.

To prevail on this issue, petitioners needed to establish by a preponderance of the evidence that such was the parties' intent. While disputed fact issues as to which parties have produced credible evidence are rarely so close that burden of proof matters, we are not convinced. Medware did require a loan application, and

---

[11]We typically address this question in cases in which the Commissioner has proposed an alternative characterization for the alleged loan. See, e.g., Calloway v. Commissioner, 135 T.C. 26, 27 (2010) (stock sale proceeds), aff'd, 691 F.3d 1315 (11th Cir. 2012); Kaider v. Commissioner, T.C. Memo. 2011-174, slip op. at 13-14 (services compensation); Teymourian v. Commissioner, T.C. Memo. 2005-232, 90 T.C.M. (CCH) 352, 352 (2005) (constructive dividends). Respondent has proffered no alternative characterization here, perhaps because the record suggests no plausible alternative explanation for the Medware advances. For instance, petitioners offered testimony, and we have found as a fact, that CHMD provided no services and sold no products to Medware during 2007. Dr. Holden explained that he had never met anyone at Medware, which tends to rule out a gift.

**[\*28]** petitioners' witnesses testified unequivocally that the Medware advances were loans. But neither Ms. Garcia nor Dr. Holden nor Mr. Rhondo could recall any terms of the alleged loan. Further, the manner in which the funds were advanced and the utter absence of evidence that Medware ever expected or sought repayment strongly suggest that no genuine loan was intended. Although we may not know the reason for the Medware advances, "the paucity of records * * * makes it impossible to separate the possible wheat from the definite chaff in the transfers of funds" at issue here. See Welch v. Commissioner, 75 T.C.M. (CCH) at 2068-2069 (taking into account "confusion, contradictions, and other anomalies" in the facts, including the "unusual business habits" of the purported lender, in concluding that the taxpayer had not established that disputed advances were loans).

Petitioners have failed to establish that the Medware advances were nontaxable loans, and we will sustain respondent's determination that these advances were taxable income to CHMD.

    2.    <u>Ms. Garcia</u>

On cross-examination Ms. Garcia testified that CHMD had paid her interest on a loan during 2007. Respondent then introduced into evidence a declaration dated December 22, 2012, and signed by Ms. Garcia under penalty of perjury, in

[*29] which she describes making loans to CHMD in April and December 2004 and in April 2007. Ms. Garcia declared that she had lent $3,985 on April 2 and $9,000 on April 16, 2007.

Respondent concedes that Ms. Garcia made these loans but objects that petitioners have not shown that the lent funds were deposited into the BofA account. With respect to the April 2 loan, although we found Ms. Garcia's testimony credible and believe that she made the loan, we can find no evidence that the funds were ever deposited into CHMD's bank account. Consequently, the amount of the April 2 loan cannot be applied to reduce the amount of unreported deposits treated as income in respondent's bank deposits analysis. With respect to the April 16 loan, however, CHMD's bank statement reflects a $9,000 deposit from "American Express DES" on that day. Ms. Garcia's declaration does not reveal the means by which she made the April 16 loan, but it is plausible that she transferred $9,000 to CHMD from an American Express credit card. In any event, we find the exact coincidence between the amounts of the April 16 deposit and loan persuasive when coupled with Ms. Garcia's testimony. Petitioners have established that CHMD received and deposited a $9,000 nontaxable loan from Ms. Garcia on April 16, 2007.

**[\*30]** In sum, we conclude that CHMD's total income for 2007 was $1,085,190, computed as follows:

| Source | Amount |
|---|---|
| Total deposits into BofA account | $1,316,827 |
| Nontaxable deposits conceded by respondent | (227,147) |
| Nontaxable deposit of April 16, 2007, loan from Ms. Garcia | (9,000) |
| Taxable deposits into Dr. Holden's personal account | 4,510 |
| Total income of CHMD | 1,085,190 |

Consequently, CHMD received but failed to report $162,176 of income for 2007.

## II.    Disallowed Deductions

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any claimed deduction. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). A taxpayer must identify each deduction available, show that he or she has met all requirements therefor, and keep books or records that substantiate the expenses underlying the deduction. Sec. 6001; Roberts v. Commissioner, 62 T.C. 834, 836 (1974). If a taxpayer's records are lost or destroyed because of circumstances beyond his control, the taxpayer may instead

[*31] substantiate the expenses with other credible evidence. See Malinowski v. Commissioner, 71 T.C. at 1124-1125.

Under Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), if a taxpayer claims a deduction but cannot fully substantiate the expense underlying the deduction, the Court may generally approximate the allowable amount, bearing heavily against the taxpayer whose inexactitude is of his own making. The Court must have some basis upon which to make its estimate, however, or else the allowance would amount to "unguided largesse". Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

A.    Business Expenses

Section 162(a) permits a taxpayer to deduct all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on the taxpayer's trade or business. "To qualify as an allowable deduction under [section] * * * 162(a) * * * an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971). An expense satisfies the second element only if it is "directly connected with or pertaining to the taxpayer's trade or business". Sec.

**[*32]** 1.162-1(a), Income Tax Regs. An expense qualifies as necessary if it is "appropriate and helpful" to the taxpayer's business, Welch v. Helvering, 290 U.S. at 113, and as ordinary if the underlying transaction is a "common or frequent occurrence in the type of business involved", see Deputy v. du Pont, 308 U.S. 488, 495 (1940). A taxpayer must establish these essential elements with credible evidence. See sec. 1.6001-1(a), Income Tax Regs.

While business expenses are generally deductible, personal, living, and family expenses are typically nondeductible. See sec. 262(a). A business expense claimed as a deduction must be incurred primarily for business rather than personal reasons. See Walliser v. Commissioner, 72 T.C. 433, 437 (1979). Where an expense exhibits both personal and business characteristics, the "test[] requires a weighing and balancing of all the facts * * * bearing in mind the precedence of section 262, which denies deductions for personal expenses, over section 162, which allows deductions for business expenses." Sharon v. Commissioner, 66 T.C. 515, 524 (1976) (citing costs of commuting and ordinary clothing as examples of expenses helpful and necessary to an individual's employment that are "essentially personal" and hence nondeductible), aff'd per curiam, 591 F.2d 1273 (9th Cir. 1978).

**[*33]** We apply the foregoing rules to each category of disputed business expenses in turn.

####### 1.  Salaries and Wages

Of CHMD's claimed $280,774 salaries and wages deduction, $111,138 remains in dispute (disputed salaries).  The disputed salaries exclude wages CHMD paid to employees for which it prepared Forms W-2, Wage and Tax Statement, and also remuneration paid to Ms. Garcia that she reported on her 2007 Form 1040. CHMD prepared no Forms W-2 and filed no Forms 1099-MISC, Miscellaneous Income, with respect to any portion of the disputed salaries.   Petitioners claim that CHMD paid $76,794 of salaries and wages to five individuals to whom it did not issue either Forms W-2 or Forms 1099-MISC.

Section 162(a)(1) authorizes a deduction for "salaries or other compensation for personal services actually rendered".  To be deductible, compensation must be reasonable and "purely for services."  Sec. 1.162-7(a), Income Tax Regs.; accord Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), aff'g T.C. Memo. 1971-200.

[*34] Petitioners produced copies of canceled checks, all cashed during 2007, establishing total payments of $74,994,[12] consisting of $28,000 paid to Dr. Mann, $4,000 paid to Dr. Andujar, $8,755 paid to Ms. Do, and $34,239 paid to Ms. Niangnouansy (salary checks). Ms. Garcia identified Drs. Mann and Andujar as physicians who saw patients at CHMD's Anaheim office, Ms. Do as a nurse practitioner who worked at the Anaheim office, and Ms. Niangnouansy as an office manager at the Anaheim office. She further recognized the salary checks as payroll checks prepared by ADP.[13] Ms. Garcia explained that the salary checks represented payment for services as employees or independent contractors.

---

[12]Petitioners' Exhibit 18-P claims to substantiate $76,794, but it double-counted check No. 557, payable to Ms. Niangnouansy, in the amount of $1,440, which appears twice within the exhibit. Petitioners also included check No. 528, payable to Jennifer M. Rivera, in the amount of $360. Although the check was not cashed until August 30, 2007, it was issued on December 29, 2006. For a cash method taxpayer such as CHMD, where a check is issued in one tax year but presented and honored in a subsequent tax year, "[f]or Federal tax purposes, the subsequent payment of the check relates back to the date of delivery". See Weber v. Commissioner, 70 T.C. 52, 57 (1978). Hence, the check to Ms. Rivera was deductible only for 2006, its tax year of issue, not for 2007.

[13]CHMD's P&L includes a "Salaries & Wages" account, and a few checks payable to Drs. Mann and Andujar and Ms. Do are listed there. Most of the Salaries & Wages account entries on the P&L do not include specific check numbers and payees, but from their notations and periodicity, we conclude that these entries reflect aggregated payroll expenses as computed by ADP. The dates on the canceled checks petitioners produced correspond to the dates on which CHMD accrued these payroll expenses.

[*35] Respondent contends that the foregoing evidence does not adequately substantiate any portion of the disputed salaries because: (1) petitioners provided no written evidence of the services provided, none of the named individuals testified, and Ms. Garcia did not provide enough detail in her testimony concerning the specific services rendered by these five individuals; (2) CHMD did not issue Forms W-2 or Forms 1099-MISC to any of the named individuals; and (3) although Ms. Garcia testified that Drs. Mann and Andujar had their own professional corporations, the salary checks were made payable to and endorsed by them personally.

Beginning with respondent's first contention, Ms. Garcia credibly testified to the roles Drs. Mann and Andujar, Ms. Do, Ms. Niangnouansy, and Ms. Rivera played in CHMD's practice. She noted, for example, that Dr. Mann "provided family medicine services to our patients in the Anaheim office." Respondent demands greater detail about these "services", but for most anyone who has ever visited a doctor's office, medical services are privileged and private. Moreover, family medicine is hardly a mysterious and esoteric subspecialty demanding further elucidation. Respondent points to no authority, and we know of none, that requires the service provider's own testimony or particular forms of written documentation for substantiation of compensation expenses. Ms. Garcia's specific,

[*36] uncontroverted testimony and the canceled checks clearly suffice.  If respondent desired the doctors' testimony, he was free to subpoena either or both of them (much easier for respondent than for petitioners, because of the rules regarding payment of travel and fee expenses) and to call them.

That CHMD failed to issue Forms W-2 or 1099-MISC to these five individuals does not mean that it did not pay them for services.  Although the absence of tax forms could indicate that the payments were for purposes other than services compensation, Ms. Garcia identified the salary checks as payroll checks prepared by ADP.  Consistent with that testimony, the salary checks were periodically issued, and the other canceled checks in the record have four-digit numbers whereas the salary checks have three-digit numbers.  Ms. Garcia testified that, along with handling CHMD's payroll, ADP produced and issued Forms W-2 on CHMD's behalf.  That ADP issued payroll checks to these five individuals but may not have issued them Forms W-2 or 1099-MISC does not establish that the payroll checks were in fact payments for something else; rather, these facts indicate that ADP either erred or was erroneously advised that CHMD would issue Forms 1099-MISC.  CHMD may not have issued or caused to be issued by ADP

[*37] these forms, as the Code would have obliged it to do.[14] Section 6721(a) prescribes a monetary penalty for neglecting that obligation, not disallowance of a deduction for the payment that should have been reported. In any event, we need not speculate about why tax forms were apparently not issued because issuance of such forms is not a prerequisite to the deduction of salaries and wages.

Respondent's third and final contention similarly misses the mark. That Drs. Mann and Andujar had their own corporations does not mean that they always worked exclusively for their corporations or received payments for their services in their corporate names. Indeed, respondent alleges that certain checks made out to Dr. Holden and deposited into his personal account should have been payable to CHMD. Additionally, the parties stipulated that Dr. Holden was erroneously issued Forms 1099-MISC under his personal Social Security number rather than CHMD's employer identification number. Plainly, it is not impossible or even all that unusual for a physician with a professional corporation to receive payments for services rendered in his or her own name.

---

[14]Sec. 6041 and the regulations thereunder require every person engaged in a trade or business to prepare and file Form 1096, Annual Summary and Transmittal of U.S. Information Returns, or Form 1099-MISC for each person to whom it pays, in the course of its trade or business, services compensation of at least $600 during the taxable year, unless it issues that person a Form W-2. Secs. 1.6041-1(a)(1)(i)(A), (2), 1.6041-3(a), Income Tax Regs.

[*38] Ms. Garcia credibly testified, after reviewing the salary checks, that the salary checks all represented compensation for services. Considering their periodicity and the nature of the services being compensated, the payments are reasonable in amount. Petitioners have adequately substantiated $74,994 of ordinary and necessary expenses for salaries and wages of CHMD's staff, and we hereby redetermine respondent's determination to that extent. As for the $36,144 balance of the disputed salaries, with respect to which petitioners have offered no evidence or argument except for faulty evidence relating to $1,800 of that amount, we will sustain respondent's determination.

### 2. Equipment Rental

Of CHMD's claimed $178,762 rental expense deduction, $80,300 remains in dispute. Petitioners attribute this amount entirely to equipment rental expenses.

Ms. Garcia and Dr. Holden both testified that CHMD rented numerous items of equipment used in the operation of Dr. Holden's medical practice. These items ranged from specialized medical equipment, such as the Thermage machine, to mundane office equipment, such as copy machines. Ms. Garcia identified LFG, MBF Leasing, HPSC, IFC Credit Corp., Great America, Banc of America Leasing, Compare Business Systems, Inc., Protection One, and GE (collectively, leasing companies) as companies from which CHMD had leased equipment used in its

[*39] business during 2007. Petitioners offered bank statements and canceled checks documenting payments CHMD made during 2007 to each of the leasing companies. In comparing CHMD's bank statements against its P&L, we have identified additional payments CHMD made to the leasing companies during 2007.[15] Ms. Garcia could not recall which specific equipment CHMD rented from each leasing company, with the exception of Protection One, from which CHMD leased DVR security cameras and recorders for both offices. Annotations on the P&L indicate that CHMD rented, inter alia, its copy machines from Banc of America Leasing, its Thermage machine, omni light, and hyperbaric chamber from GE, security equipment from Protection One, and telephone-related items from Great America. In total, the record contains evidence of payments to the leasing companies totaling $77,858.

---

[15]In some instances, a bank statement or canceled check establishes that a payment was made to HPSC, but the P&L lists the payee as GE. Because the dollar amounts and dates correlate with one another, we consider this discrepancy unimportant. Also, in numerous instances, the total payment amount included taxes, finance charges, insurance charges, and/or charges for associated services, all of which Ms. Garcia tracked in separate categories of the P&L. Because CHMD claimed an equipment rental expense deduction equal to the total expenses recorded in the equipment rental category on its P&L, we have omitted taxes, finance charges, and other ancillary items in computing total substantiated equipment rental expenses.

**[*40]** Respondent deems the foregoing evidence insufficient because (1) Ms. Garcia was unable to specifically identify which items CHMD rented from each leasing company; (2) petitioners produced no lease agreements with any of the leasing companies; (3) the P&L lists no equipment rental expenses for Marlin or Key; (4) CHMD made no lease payments to either Marlin or Key during the 2007 tax year; and (5) neither Ms. Garcia nor Dr. Holden specifically mentioned Marlin or Key.

With respect to respondent's first two contentions, the Court finds it unremarkable that Ms. Garcia was unable to associate each specific leased item with its respective lessor, six years after the tax year at issue and four years after she ceased working for CHMD. She and Dr. Holden adequately identified the leased equipment, and Ms. Garcia adequately identified the lessors. To the extent that evidence linking each payment to the specific equipment to which it applied is necessary, CHMD's P&L provides it.[16] Furthermore, petitioners credibly explained why they could not produce written contracts between CHMD and each of the leasing companies: Many of CHMD's records, and in particular those

---

[16]Dr. Holden's creditors schedule filed with the bankruptcy court likewise links many of the leasing companies with the specific equipment leased from them. For example, the schedule reflects that CHMD leased two laser machines, a neurometrix machine, a hyperbaric chamber, and a sauna from GE and credit card machines from MBF Leasing.

**[*41]** relating to creditors such as the leasing companies, were destroyed in an unfortunate (and drenching) turn of fate in 2009. Between Ms. Garcia's testimony and the ample documentary evidence, we think petitioners have amply reconstructed this evidence. See Malinowski v. Commissioner, 71 T.C. at 1124-1125.

We need not address respondent's last three contentions because, as described infra part II.C, we conclude that the purported leases with Marlin and Key were in fact conditional sales contracts, so payments CHMD made to Marlin and Key must be analyzed accordingly.

Petitioners have established that CHMD paid $77,858 of equipment rental expenses during 2007. The items rented, ranging from specialized medical equipment to typical office equipment, were directly connected with and appropriate and helpful to CHMD's operation of two medical offices that also provided cosmetology services. It is common, if not customary, for a professional office to lease rather than purchase specialized equipment, copy machines, and computer systems; and the sheer number of leasing companies from which CHMD rented equipment demonstrates the existence of a robust market for such services. The equipment rental expenses were therefore ordinary as well as necessary. We hold that petitioners have established with credible evidence all essential elements

[*42] under section 162(a), see Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. at 352; sec. 1.6001-1(a), Income Tax Regs., and the Court will redetermine respondent's disallowance of CHMD's equipment rental deductions to the extent of an additional $77,858 deduction.

### 3. Supplies

Of CHMD's claimed $122,144 supplies expense deduction, $11,613 remains in dispute. This amount represents the sum of three expenses that respondent contends CHMD was not entitled to deduct:

| Date | Quickbooks subcategory | Payee | Amount |
|------|------------------------|-------|--------|
| Jan. 22, 2007 | Pharmaceuticals | American Express | $1,848 |
| Jan. 22, 2007 | Medical | American Express | 8,641 |
| Mar. 9, 2007 | Pharmaceuticals | American Express | 1,124 |

These expense items appear in CHMD's P&L. The P&L indicates that check Nos. 2255, 8555, and 8565 were used to make the payments, but of these only one is shown in the bank statements as having cleared. That check, No. 2255, was used for the March 9 payment, which cleared CHMD's account on March 12, 2007. But the amount of this check is only $500, not $1,124. There is no identifiable evidence that the other two checks, Nos. 8555 and 8565, ever cleared the bank. Otherwise, petitioners offered no testimony or documentary evidence to

[*43] substantiate that these expenses were actually incurred and paid or to explain the discrepancies, and no evidence of the alleged expenditures' purposes. There is insufficient evidence here to warrant application of the Cohan rule. See Vanicek v. Commissioner, 85 T.C. at 743. We will consequently sustain respondent's disallowance of $11,613 of CHMD's claimed supplies expense deduction.

4.  Office

Of CHMD's claimed $37,270 office expense deduction, $36,258 remains in dispute. This amount represents the sum of two expenses that respondent contends CHMD was not entitled to deduct:

| Date | Quickbooks subcategory | Payee | Amount |
|------|------------------------|-------|--------|
| Jan. 5, 2007 | Office expense | Platinum Plus | $12,649 |
| Feb. 18, 2007 | Office expense | Bank of America Visa | 23,610 |

These expense items appear in CHMD's P&L. Petitioners introduced no evidence--other than the notation in the P&L that check No. 8543 was used to make the payment--to establish that the January 5 expense was actually incurred and paid, or if so, for what purpose. There is no evidence in the bank statements that this check ever cleared. CHMD's bank statement reflects that check No. 2207, which the P&L indicates was used to make the February 18 payment, cleared CHMD's account on February 26, 2007. Curiously, the amount of that check as cashed was

**[*44]** only $1,000, not $23,610, suggesting that CHMD may have accrued the full amount of a credit card statement but made only a $1,000 payment. In any event, petitioners have not established that the remaining $22,610 of expenses was in fact incurred and paid nor provided evidence of a business reason for any amount of the February 18 expense. We will sustain respondent's disallowance of $36,258 of CHMD's office expense deduction.

### 5. Dues and Subscriptions

Of CHMD's claimed $11,973 dues and subscriptions expense deduction, $6,401 remains in dispute. This amount represents the sum of five expenses that respondent contends CHMD was not entitled to deduct (disputed dues):

| Date | Payee | Amount |
|---|---|---|
| Mar. 29, 2007 | Advanta | $750 |
| Mar. 29, 2007 | Advanta | 1,100 |
| Sept. 28, 2007 | Advanta | 2,000 |
| Oct. 29, 2007 | Advanta | 551 |
| Oct. 29, 2007 | Advanta | 2,000 |

[*45] CHMD's P&L lists checks numbers for these five items, and canceled checks as well as its bank statements reflect that these checks did clear CHMD's account. However, the evidence suggests that CHMD accrued the full amounts of expenses charged to the Advanta card as reflected on its monthly statements but made only partial payments toward the balance owed. Check No. 2297, which the P&L associates with the two March 29 expenses totaling $1,850, had a face amount of only $300. Similarly, check No. 9117, which the P&L links to the $2,000 September 28 expense, had a face amount of only $500. And check No. 2504, which the P&L associates with the two October 29 expenses totaling $2,551, had a face amount of only $540. Because CHMD computed its income for tax purposes on the cash method, it was entitled to deduct only expenses actually paid. See sec. 1.446-1(c)(1)(i), Income Tax Regs. Nevertheless, by charging expenses to the Advanta card, CHMD actually paid those expenses using funds borrowed from Advanta and so would be entitled to deduct them in full. See Granan v. Commissioner, 55 T.C. 753, 755 (1971).

Relying on Granan, respondent objects that, even if the disputed dues were deductible expenses, they would have been deductible when charged to the Advanta card, not when payments were made toward the balance owed on the Advanta card. In Granan, the taxpayer had borrowed funds to pay medical

[*46] expenses and then claimed deductions for those expenses when, in a subsequent tax year, he made payments on the loan. Id. Applying "the general rule * * * that when a deductible payment is made with borrowed money, the deduction is not postponed until the years in which the borrowed money is repaid", we held that the taxpayer was not entitled to the claimed deductions in the subsequent year. Id. at 755-756. CHMD accrued expenses for and made payments toward Advanta card bills during 2007, but similarly to the taxpayer in Granan, it claimed deductions for 2007 for the payments to Advanta rather than for the underlying expenses. Therefore, respondent contends, they must establish that the underlying expenses were actually paid in (and hence deductible for) the tax year at issue.

Although the record does not disclose precisely when CHMD incurred the underlying obligations or when it charged those obligations to the Advanta card, the dates on which CHMD accrued the payments to Advanta establish general timeframes. It is plausible that the expenses underlying the Advanta charges accrued on March 29, 2007, were incurred and paid in 2006. With respect to the September 28 and October 29, 2007, charges--accrued just before or during the fourth quarter of 2007--the underlying expenses were more likely than not

[*47] incurred and paid in the 2007 tax year.  Therefore, to the extent those expenses were ordinary and necessary, petitioners would be entitled to deduct them.

The evidence in the record indicates those underlying expenses satisfied the requirements of section 162(a).  Ms. Garcia confirmed that the Advanta checks were for dues and subscriptions.  The P&L corroborates Ms. Garcia's assertion.  The P&L "memo" entry for the September 28 expense and one of the October 29 expenses is "Amespa".  Although it may now be defunct, for the year at issue the American Medical Education & Services Physician Association (AMESPA) was a membership organization that purported to provide continuing education to physicians.  We find that payments to such an organization qualify as ordinary and necessary business expenses of CHMD's medical and cosmetology offices.  The memo entry for the second October 29 expense is "DEA Registra".  Federal law requires physicians who dispense controlled substances to register annually with the Drug Enforcement Administration (DEA), 21 U.S.C. sec. 822(a)(1), (b) (2006); 21 C.F.R. sec. 1301.11 (2009), and we conclude that the second October 29 expense served this purpose.  Hence, the expenses underlying the September 28 and October 29 disputed dues were ordinary and necessary business expenses deductible under section 162(a).

**[*48]** We find that CHMD was entitled to deduct $4,551 of the disputed dues; otherwise, we sustain respondent's determination concerning them.

### 6. Contract Labor

Of CHMD's claimed $24,744 deduction for contract labor expense, $9,970 remains in dispute. This amount represents the sum of five expenses that respondent contends CHMD was not entitled to deduct:

| Date | Payee | Amount |
|------|-------|--------|
| Dec. 17, 2007 | Leonel Miguez | $2,780 |
| Dec. 21, 2007 | Francisco Alatriste | 1,500 |
| Dec. 24, 2007 | Leonel Miguez | 1,400 |
| Dec. 24, 2007 | Leonel Miguez | 1,500 |
| Dec. 31, 2007 | Francisco Alatriste | 2,790 |

Dr. Holden related--and a "Loss List" under CHMD's insurance policy supports him--that on or around September 29, 2007, a pipe in the Orange office burst after heavy rains, causing severe damage that took a year to fully repair. Ms. Garcia and Dr. Holden testified that CHMD hired Leonel Miguez, a construction contractor, to repair damaged drywall and flooring and to remodel part of the office, and that Mr. Miguez brought in Francisco Alatriste, an electrician, to perform electrical work related to the repairs. Petitioners also introduced four canceled checks dated for and cashed during December 2007 that establish

[*49] payments totaling $5,680 to Mr. Miguez and $1,500 to Mr. Alatriste. With respect to these four payments, petitioners have established actual payment and offered credible evidence of the services remunerated and the business reason for them.

Although petitioners did not introduce a canceled check to substantiate the claimed $2,790 payment to Mr. Alatriste on December 31, 2007, reflected in CHMD's P&L, the P&L links that payment to check No. 2705. That check did not clear CHMD's account during 2007, and there is no evidence it cleared in a later year. Because CHMD reported its income for tax purposes on a cash basis, it was not entitled to deduct expenses for Mr. Alatriste's services until it had actually paid those expenses. See sec. 1.446-1(c)(1)(i), Income Tax Regs. CHMD may have delivered a $2,790 check to Mr. Alatriste in 2007, but a check is merely a conditional payment and relieves an obligor of his liability only if and when it is presented and honored. See Weber v. Commissioner, 70 T.C. 52, 57 (1978); Heritage Org., LLC v. Commissioner, T.C. Memo. 2011-246, slip op. at 13. "For Federal tax purposes, the subsequent payment of the check relates back to the date of delivery so as to allow deductions even where checks are presented and honored during later years." Weber v. Commissioner, 70 T.C. at 57. Absent evidence that a check was presented and honored, however, a cash basis taxpayer may not deduct

[*50] the underlying expense.  See id.  That rule applies squarely to CHMD's December 31 payment to Mr. Alatriste and precludes its deduction.

Respondent deems petitioners' evidentiary showing insufficient across the board because:  (1) neither Mr. Miguez nor Mr. Alatriste testified at trial, and petitioners provided no written quotes, invoices, receipts, contracts, or other documents relating to their alleged services and (2) petitioners have not explained why, given that TCI hired B&B to perform reconstruction work, CHMD, a tenant, would need to hire and pay its own construction crew.

With respect to respondent's first objection, testimony from Messrs. Miguez and Alatriste might have enhanced petitioners' evidentiary showing, but it was far from necessary.  Together with the testimony and documentary evidence of the 2007 flood, Ms. Garcia's and Dr. Holden's testimony concerning the services these men provided adequately established the nature of those services.  Further, because the 2009 flood destroyed many of CHMD's original records, petitioners were entitled to substantiate these expenses with credible evidence other than original receipts.  See Malinowski v. Commissioner, 71 T.C. at 1124-1125.

As for respondent's second objection, TCI did hire B&B to perform repair work after the 2007 flood, but we see no reason why this fact would cast doubt on whether CHMD's payments to Messrs. Miguez and Alatriste were ordinary and

[*51] necessary business expenses. CHMD's lease for the Orange office is not in the record. Dr. Holden testified that utilities were not included in the lease, but we otherwise know none of its terms. In particular, we do not know how the lease allocated financial responsibility for repairs and maintenance of the leasehold improvements at Orange office, and whether there were common areas or structural components that B&B might have repaired. In short, we have no factual basis for presuming, as respondent would have us do, that TCI should have borne, and did bear, all repair costs associated with the 2007 flood. Respondent, too, is free to call witnesses once petitioners have met their burden of going forward with credible evidence on the disputed factual matter.

In sum, respondent's objections presume a greater evidentiary burden than that actually required under section 162(a). Petitioners have substantiated $7,180 of ordinary and necessary contract labor expenses. We will reject and redetermine respondent's determination to that extent.

### 7. Auto and Truck

The entire amount of CHMD's claimed $10,541 auto and truck expense deduction remains at issue. Although the familiar rules of section 162(a) still apply, the expenses underlying this deduction are subject to rules of substantiation that supersede the Cohan doctrine. Sanford v. Commissioner, 50 T.C. 823, 827-

[*52] 828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T, Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).  Specifically, section 274(d) provides that no deduction shall be allowed for, among other things, expenses with respect to listed property (as defined in section 280F(d)(4) and including passenger automobiles) "unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement" certain specific elements.  For expenses with respect to a passenger automobile, those elements are:  (1) "[t]he amount of each separate expenditure", (2) the amount (in time or mileage) of each business use, (3) the date of each expenditure or use, and (4) the business purpose of each expenditure or use.  Sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).  If the taxpayer cannot produce records adequate to satisfy section 274(d) because those records were lost through circumstances beyond his control, "such as destruction by * * * flood," the taxpayer may substantiate an expense "by reasonable reconstruction of his expenditure or use."  Id. para. (c)(5), 50 Fed. Reg. 46022.

Petitioners' Exhibit 24-P, which consists of numerous canceled checks and annotated bank and credit card statements, establishes the amounts and dates of the auto and truck expenses for which CHMD claimed deductions.  Many of the

[*53] checks were payable to Ms. Garcia. She testified that these payments represented a "car allowance" paid to her as an independent contractor because she often drove back and forth between the Orange and Anaheim offices and also to other locations for projects necessary for the business. Ms. Garcia stated that her monthly car payment was $646, and petitioners' documentary evidence reflects that CHMD paid that amount to Ms. Garcia monthly throughout 2007. Because these amounts represent part of Ms. Garcia's independent contractor compensation, they constitute services compensation rather than auto and truck expense and are deductible as such. See sec. 162(a)(1); sec. 1.162-7(a), Income Tax Regs.

In addition to the payments related to Ms. Garcia's car, CHMD also made at least two payments toward Dr. Holden's Mercedes Benz. Ms. Garcia testified that in addition to seeing patients at the Orange and Anaheim offices, Dr. Holden typically spent his mornings visiting nonambulatory patients at board and care facilities, skilled nursing facilities, assisted living facilities, and Chapman Hospital. She noted that he sometimes returned to these rounds later in the day. Even assuming that Dr. Holden drove his Mercedes during these patient visits, petitioners have not established the date, mileage, and purpose of each business use of the vehicle, nor the extent of business versus personal use. Hence,

[*54] petitioners have not established that these expenses were deductible. See

secs. 262(a), 274(d); Walliser v. Commissioner, 72 T.C. at 437.

Finally, petitioners offered no evidence as to the business purpose or other

reason for four miscellaneous expenses--a $46 credit card charge to "Shell Oil", an

$84 check payment to "PepBoys Auto", a $46 check to Ms. Garcia,[17] and check No.

8779, for $377, to an unknown payee--documented in Exhibit 24-P. Because

petitioners have not established a business purpose for any of these expenditures,

they are not deductible.

In sum, petitioners have not, to the extent required by section 274(d),

substantiated any auto and truck expense, so we will sustain respondent's

determination in that regard. We will, however, allow an additional $7,752 salaries

and wages expense deduction for Ms. Garcia's car payments.

B.    Interest

The entire amount of CHMD's $80,099 interest expense deduction remains

in dispute. CHMD's P&L reflects that this amount consists of $47,396 of loan

interest and $32,703 of finance charges.

---

[17]The check is dated May 3, 2007, and bears the notation "U Haul Gas Ana Move" on the memo line. One might infer that this check reimbursed Ms. Garcia for fueling a rented U-Haul truck used in moving CHMD's property out of the Anaheim office postclosure, but that office did not close until July 2007, two months after the check was written.

[*55] Complementing the allowance in section 162 of deductions for business expenses, section 163 authorizes a corporation to deduct "all interest paid or accrued within the taxable year on indebtedness", including interest paid or accrued on business-related debt. As with other business expenses, however, a taxpayer must substantiate any interest expense for which he claims a deduction. See sec. 6001; Roberts v. Commissioner, 62 T.C. at 836.

To substantiate CHMD's claimed interest expense, petitioners offered Ms. Garcia's testimony and Exhibit 20-P, which consists of 135 pages of canceled checks and annotated bank statements. At trial petitioners' counsel afforded Ms. Garcia time to review the documents in Exhibit 20-P, and after she advised that she had completed her review, asked her whether any of the payments reflected in those documents were interest payments. Ms. Garcia testified that the documents reflected "[v]arious payments to credit cards, leasing companies, [and] loan repayments" and that some of them were interest payments. She explained that, when she entered a loan or credit card payment into Quickbooks, she would record any interest or finance charge separately from the payment toward principal.

When petitioner's counsel asked whether all of the payments reflected in Exhibit 20-P were "ordinary" and "necessary" payments for CHMD's business, Ms. Garcia answered affirmatively. The Court found Ms. Garcia to be a credible

**[*56]** witness, and we believe this answer to have been sincere. Nevertheless, we find it implausible that any person could, even with prior preparation, affirm with certainty after only a few moments' scrutiny that 135 documents all shared a particular, substantive character. We therefore give the foregoing, blanket assertion little weight.

Turning to Exhibit 20-P itself, to facilitate our analysis we classify the payees on the alleged interest payments into three groups: (1) Dr. Holden and Ms. Garcia, (2) Marlin and some of the leasing companies, and (3) credit card companies and others.

### 1. Dr. Holden and Ms. Garcia

Exhibit 20-P includes one check, dated January 8, 2007, in the amount of $583, made out to Dr. Holden. No facts link this purported interest check to any loan from Dr. Holden to CHMD or otherwise tend to show that such a loan existed. We have only Ms. Garcia's generalized testimony that some of the checks in Exhibit 20-P were for interest. We cannot, on the current record, conclude that this check to Dr. Holden was among them.

Next, Exhibit 20-P includes six canceled checks made out to Ms. Garcia that petitioners contend reflect interest paid to her in 2007. Ms. Garcia's testimony and her prior written declaration established that she lent money in 2004 to finance

[*57] the acquisition of the Anaheim office and for practice expenses and that she charged interest on those loans.

Ms. Garcia confirmed that two of the checks in Exhibit 20-P--both in the amount of $208--covered interest only. A third check for $1,000 bears the notation "Int Loan" on the memo line, much like the "Loan Repay Int" notation on one of the checks Ms. Garcia confirmed was for loan interest. We conclude that petitioners have adequately substantiated these three payments of interest, and that the underlying loans had a clear nexus to CHMD's business.

We reach the opposite conclusion regarding the other three payments. Ms. Garcia expressed uncertainty as to whether the fourth check, for $1,000, was actually for interest or instead reimbursement for an office supplies purchase. The fifth check, for $10,000, is marked "Loan Repayment Bal Paid in Full", which together with its round number amount strongly suggests that it represented full payment of the principal balance on one of Ms. Garcia's loans to CHMD. CHMD's P&L reflects that $15 of this payment constituted interest, but petitioners offered no corroborating testimony or documentary evidence of this fact. For the foregoing reasons, respondent properly disallowed CHMD's deduction of these two claimed interest expenses.

**[\*58]** Ms. Garcia testified that the sixth and final check, dated April 6, 2007, in the amount of $167, represented reimbursement of the interest on her car payment. But that same day CHMD also wrote her check No. 2304 for the full amount of her car payment, interest included. Moreover, even assuming that Ms. Garcia remitted $167 to her lender after depositing CHMD's check, the character of that second payment does not translate through to the first. Interest is "compensation for the use or forbearance of [borrowed] money". Deputy v. Dupont, 308 U.S. at 498. A payment to an independent contractor intended to offset the cost of her contract-related car travel is not compensation for the use of borrowed funds. It is, however, deductible under section 162(a)(1), and we will allow it on that basis.

We conclude that petitioners have adequately substantiated $1,416 of interest expense paid to Ms. Garcia and an additional $167 of salaries and wages expense.

2. Marlin and Leasing Companies

Exhibit 20-P includes numerous checks payable to Marlin, Banc of America Leasing, Great America, GE, and HPSC. Beginning with Marlin, having compared Marlin's payment history report for CHMD with CHMD's P&L and bank statements, we conclude that petitioners have adequately substantiated the

[*59] following late fees paid to Marlin:[18]

| Check No. | Amount | Date posted |
|-----------|--------|-------------|
| 2184 | $24 | 2/16/2007 |
| 2256 | 194 | 3/12/2007 |
| 8861 | 194 | 6/8/2007 |
| 8918 | 194 | 7/13/2007 |
| 2554 | 194 | 11/9/2007 |
| 2619 | 194 | 12/4/2007 |
| Total | 994 | |

CHMD properly deducted these amounts.[19]

---

[18]Our comparison of these documents revealed several discrepancies in CHMD's P&L. On February 9, 2007, CHMD wrote check No. 7750 for $1,417 and booked a $24 finance charge from Marlin. Marlin's payment history record reflects that this amount is a "[f]ee". We will allow deductions for these fees under sec. 162(a) because of their nexus to CHMD's acquisition of equipment necessary to its business.

In addition to the amounts listed in the table, CHMD accrued Marlin's standard late fee (15% of CHMD's monthly lease payment) in August and September 2007, but Marlin's records reflect that it did not impose a late fee in those months. On December 4, 2007, CHMD booked a $200 finance charge from Marlin, but Marlin's records reflect only its standard, $194 late fee. We will allow only the amounts corroborated by Marlin's record.

[19]We have characterized these amounts as late fees rather than finance charges on the basis of Marlin's payment history record. Marlin's contract with CHMD provides for a late charge of the greater of $20 or 15% of the past-due amount and creates a contractual obligation on the part of CHMD to pay that amount. "[A]lthough an indebtedness is an obligation, an obligation is not

(continued...)

[*60] As for the leasing companies, taking into account our findings concerning petitioners' substantiation of CHMD's equipment rental expenses, and having compared the relevant documents in Exhibit 20-P against CHMD's P&L and bank statements, we conclude that petitioners have adequately substantiated the following finance charges paid to the leasing companies:

| Payee | Payment form | Finance charge | Date posted |
|---|---|---|---|
| Banc of America Leasing | Check No. 2201 | $70 | 3/5/2007 |
| Banc of America Leasing | Direct debit | 100 | 4/16/2007 |
| Banc of America Leasing | Check No. 2578 | 100 | 11/20/2007 |
| Banc of America Leasing | Check No. 2654 | 100 | 12/18/2007 |
| GE | Direct debit | 99 | 1/26/2007 |
| GE | Check No. 2235 | 100 | 3/6/2007 |

---

[19](...continued)
necessarily an 'indebtedness' within the meaning of * * * [section 163]." Deputy v. Dupont, 308 U.S. 488, 497 (1940) (holding that dividend-equivalent amounts paid pursuant to a contractual obligation were not deductible under sec. 163's predecessor statute). A late fee charged by a lessor for failure to timely make a lease payment is more in the nature of a penalty than "compensation for the use or forbearance of money." Like interest, the late fee provided for in the Marlin contract is computed as a percentage of the amount owed. Unlike interest, the late fee does not accrue periodically but is instead charged only once. Regardless of whether the late fees are deductible as interest under sec. 163, because of their nexus to CHMD's acquisition of equipment used in the operation of its medical practice, they qualify as ordinary and necessary business expenses and would be deductible under sec. 162(a).

| [*61] | GE | Check No. 2236 | 242 | 3/6/2007 |
|---|---|---|---|---|
| | GE | Check No. 2237 | 50 | 3/6/2007 |
| | Great America | Check No. 2267 | 37 | 3/19/2007 |
| | Great America | Direct debit | 37 | 4/16/2007 |
| | Great America | Check No. 8933 | 74 | 7/19/2007 |
| | Great America | Check No. 9105 | 37 | 9/24/2007 |
| | Great America | Check No. 2660 | 74 | 12/21/2007 |
| | HPSC | Check No. 2147 | 239 | 2/13/2007 |
| | HPSC | Check No. 2148 | 61 | 2/13/2007 |
| | HPSC | Check No. 2149 | 88 | 2/13/2007 |
| | Total | | 1,508 | |

Ms. Garcia credibly testified that CHMD leased equipment necessary to its business from these companies, and petitioners' evidence reflects that CHMD paid each of the foregoing amounts via the same check or direct debit with which it made a lease payment. We have already determined that the lease payments were ordinary and necessary business expenses. On the basis of these facts, we conclude that CHMD paid the finance charges pursuant to its leases with the leasing companies. Accordingly, even if these amounts do not constitute interest, they are deductible under section 162(a).

**[*62]**      3.      <u>Credit Card Companies and Others</u>

Exhibit 20-P also contains numerous canceled checks and bank statements evincing payments CHMD made to Advanta, American Express, Bank of America, Capital One, and Platinum Plus, all of which appear to be credit card providers, as well as "Commercial Loans", Popular Leasing, and McKesson Medical (alternatively identified as McKesson Medical Surgical). CHMD's P&L reflects that it accrued interest or a finance charge in connection with each of these payments.

The P&L supplies the only evidence of how much of each payment was interest or a finance charge (as opposed to principal).[20] We have no evidence of what expenses gave rise to the principal balances on which interest or a finance charge was imposed. Only if those expenses were bona fide business expenses would any interest or finance charge be deductible.[21]

---

[20]Despite her broad assertion that some of the payments in Exhibit 20-P were interest, Ms. Garcia proved unable to determine what portions of payments to Commercial Loans and Capital One constituted interest and principal. Neither counsel inquired about payments to other payees.

[21]Sec. 163(h)(1) prohibits the deduction of personal interest. Although this provision expressly applies only to noncorporate taxpayers, we think it highly relevant here, where interest deductions claimed by petitioners' wholly owned S corporation would flow through to them. Allowing an S corporation to deduct interest paid on debt incurred to pay personal expenses of its sole shareholder

(continued...)

**[*63]** Ms. Garcia testified that CHMD had credit card accounts with Advanta, American Express, and Platinum Plus during 2007. But petitioners did not introduce any statements for these accounts to establish the underlying expenses. We lack sufficient evidence to determine whether these purported interest and finance charges were deductible under section 163 or section 162. As petitioners bore the burden of proof on this issue, we will sustain respondent's disallowance of these reported interest expenses.

In conclusion, of the reported interest expenses remaining in dispute, CHMD was entitled to deduct $1,416 paid to Ms. Garcia, $994 paid to Marlin, and $1,508 paid to the leasing companies, or a total of $3,918.

---

[21](...continued) would run directly contrary to the purpose of sec. 163(h). In such cases, courts may recharacterize the debt principal and any interest paid as constructive distributions to the shareholder on which the shareholder would be subject to tax, not entitled to deductions. See Noble v. Commissioner, 368 F.2d 439, 442-443 (9th Cir. 1966) (holding that a corporation could not deduct, and its sole shareholders must include in income, reimbursements paid to the shareholders for personal expenses), aff'g T.C. Memo. 1965-84; Enoch v. Commissioner, 57 T.C. 781, 793-794 (1972) (after concluding that a loan was, in substance, a personal obligation of a corporation's controlling shareholder, recharacterizing the corporation's loan repayment as a constructive distribution to the shareholder and disallowing corporation's claimed interest deductions).

- 64 -

[*64] C.    Depreciation

The entire amount of CHMD's $41,122 depreciation deduction remains in dispute.  Section 167(a) allows taxpayers engaged in a trade or business to deduct "a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business".  As with other business expenses, however, a taxpayer must substantiate any depreciation for which he claims a deduction.  See sec. 6001; Cluck v. Commissioner, 105 T.C. 324, 337 (1995); see also, e.g., Castillo v. Commissioner, T.C. Memo. 2013-72, at *14-*15 (sustaining disallowance of claimed depreciation deduction where taxpayer failed to substantiate his cost basis or otherwise allowable depreciation); Farran v. Commissioner, T.C. Memo. 2007-151, 93 T.C.M. (CCH) 1356, 1360 (2007) (sustaining disallowance of claimed depreciation deduction because of taxpayer's inadequate substantiation).  To substantiate entitlement to a depreciation deduction under the modified accelerated cost recovery system (MACRS) of section 168, a taxpayer must show that the property was used in a trade or business and establish its depreciable basis.  See Cluck v. Commissioner, 105 T.C. at 337; Liddle v. Commissioner, 103 T.C. 285, 292-293 (1994), aff'd, 65 F.3d 329 (3d Cir. 1995).

On Form 4562, Depreciation and Amortization, filed with its 2007 Form 1120S, CHMD computed its depreciation deduction as the sum of deductions for

[*65] assets placed in service before the 2007 tax year (pre-2007 assets) and for five-year recovery property placed in service during 2007 (new assets).

1.     Pre-2007 Assets

With respect to the $28,320 CHMD reported for pre-2007 assets, petitioners offered little documentary evidence and virtually no testimony.[22]  Exhibit 21-P consists of pages apparently taken from CHMD's 2005, 2006, and 2007 tax returns and Federal summary depreciation schedules (summary schedules) presumably prepared along with those returns.  The summary schedules list purported cost bases, useful life terms, and previously claimed depreciation for various items of equipment and leasehold improvements.

This evidence will not satisfy petitioners' burden of proof.  That a taxpayer claims a deduction on an income tax return is not sufficient to substantiate the underlying expense.  Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979).  An income tax return "is merely a statement of the * * * [taxpayer's] claim * * * ; it is not presumed to be correct."  Roberts v. Commissioner, 62 T.C. at 837.  We accord no greater weight to depreciation schedules prepared to facilitate filing a

---

[22]Dr. Holden described some of the equipment that CHMD owned, including an X-ray machine, but provided no further information.  Dr. Holden also testified that CHMD's accountant, Ashley Hallsman, determined which equipment items would be depreciated without his guidance.  Ms. Hallsman did not testify.

[*66] return.  See, e.g., Anyanwu v. Commissioner, T.C. Memo. 2014-123, at *28-*29 (sustaining the Commissioner's disallowance of a taxpayer's depreciation deduction where the taxpayer "did not provide any testimony or other evidence at trial to explain the numbers appearing on" the Federal summary depreciation schedule filed with her return); Basalyk v. Commissioner, T.C. Memo. 2009-100, 97 T.C.M. (CCH) 1516, 1519 (2009) (sustaining the Commissioner's disallowance of the taxpayers' depreciation deduction where the taxpayers offered no "credible testimonial or documentary evidence" to corroborate "unsubstantiated figures asserted on the[ir] depreciation schedule").

Although we recognize that records substantiating CHMD's depreciation deduction may have been destroyed in the 2009 flood, this misfortune entitled petitioners to establish the relevant facts with other credible evidence, not to rely solely on tax returns and uncorroborated assertions.  See Malinowski v. Commissioner, 71 T.C. at 1124-1125.  Although memories fade and third parties do not retain records indefinitely, petitioners could have offered testimony concerning what the assets were, when they were purchased, and/or generally how much they cost; credit card statements or vendors' records of the purchases; or materials reflecting the market prices of the same or similar assets, historically or even at the time of trial.  They offered none of these things.

**[*67]**          2.    <u>New Assets</u>

With respect to the $12,802 CHMD claimed for new assets, petitioners contend that CHMD purchased equipment from Marlin and Key during 2007 and depreciated that equipment. Aligning with that theory, the 2007 summary schedule shows depreciation of $12,802 for "COMPUTER/SOFTWARE" allegedly acquired on June 11, 2007, with a depreciable basis of $64,010. We have found that CHMD obtained equipment from and made payments totaling $33,470 to Marlin and Key during 2007 pursuant to agreements that are, facially, lease agreements. Petitioners in effect contend that these payments were not rent but rather installments toward the equipment's purchase price, and that having purchased the equipment from Marlin and Key, CHMD was entitled to depreciate it.

Whether CHMD was entitled to claim depreciation deductions for the equipment it acquired under those agreements depends upon whether it bore the economic loss of invested capital resulting from the equipment's exhaustion, wear, and tear. <u>Helvering v. F. & R. Lazarus & Co.</u>, 308 U.S. 252, 254 (1939).

> While it may more often be that he who is both owner and user bears the burden of wear and exhaustion of business property in the nature of capital, one who is not the owner may nevertheless bear the burden of exhaustion of capital investment. Where it has been shown that a lessee using property in a trade or business must incur the loss

**[*68]** resulting from depreciation of capital he has invested, the lessee has been held entitled to the statutory deduction. [Id.]

See also Corliss v. Bowers, 281 U.S. 376, 378 (1930) ("[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed--the actual benefit for which the tax is paid.").

In addressing which of the parties to an equipment lease is entitled to depreciation deductions, we and other courts have in some instances recharacterized purported lease agreements as conditional sales contracts. See, e.g., Swift Dodge v. Commissioner, 692 F.2d 651, 654 (9th Cir. 1982), rev'g 76 T.C. 547 (1981); United Circuits, Inc. v. Commissioner, T.C. Memo. 1995-605, 70 T.C.M. (CCH) 1619, 1621-1622 (1995); Lieber v. Commissioner, T.C. Memo. 1993-391, 66 T.C.M. (CCH) 529, 536-537 (1993).[23]

A conditional sale is one in which "the seller reserves title until the buyer pays for the goods. At that time, the condition is fulfilled and title passes to the buyer." Swift Dodge v. Commissioner, 692 F.2d at 653. Whereas a lease

_____

[23]The Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, sec. 201(a), 95 Stat. at 214-216, created a safe harbor under which a purported lease would be treated as a lease, and the lessor as the leased property's owner, for purposes of claiming deductions under the original accelerated cost recovery system (ACRS). See also sec. 5c.168(f)(8)-1(a), Temporary Income Tax Regs., 46 Fed. Reg. 51907 (Oct. 23, 1981). When Congress replaced ACRS with MACRS in 1986, it did not reenact the safe harbor, see Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 201(a), 100 Stat. at 2125, so we will rely upon caselaw.

[*69] contemplates only a lessee's use of the property for a limited period and its return at that period's expiration, "'a conditional sale contemplates the ultimate ownership of the property by the buyer, together with the use of it in the meantime'". Bowen v. Commissioner, 12 T.C. 446, 459 (1949) (quoting In re Rainey, 31 F.2d 197, 199 (D. Md. 1929)). Thus, the putative lessee under a conditional sales contract may claim depreciation deductions. See, e.g., McKinsey v. Commissioner, T.C. Memo. 1984-514, 48 T.C.M. (CCH) 1225, 1234, 1239 (1984).

In Swift Dodge the Court of Appeals for the Ninth Circuit examined several factors in finding that an "open-ended" vehicle lease was in fact a conditional sale. In that "open-ended" lease,

> the lessee was required to pay, when the lease terminated, the amount, if any, by which the estimated "depreciated value" of the vehicle, as set forth in the agreement, exceeded its actual wholesale value. Similarly, if the actual wholesale value of the vehicle exceeded its estimated "depreciated value," the lessee would "receive any gain which result[ed] from final disposition of the vehicle. * * *" [Swift Dodge v. Commissioner, 692 F.2d at 652 (quoting Swift Dodge v. Commissioner, 76 T.C. 547, 554, 568-569 n.11 (1981)).]

The court looked to how the agreement allocated duties, noting that the allocation did not differ from that typical of an installment sale. Id. at 653. For example, the lessee was obliged to insure the vehicle and to pay all operating and

**[\*70]** maintenance expenses not covered by the manufacturer's warranty.  See id.

Then, the court examined the parties' legal rights, again finding them "essentially

the same" as under a conditional sale contract providing for a balloon payment.

See id.  Although the lessor retained legal title and could assign its right to receive

the lessee's payments, the lessee had the right to use the vehicle so long as he

satisfied the agreement's terms, and at the conclusion of the lease term, could

acquire title to the vehicle for its "depreciation value as specified in the

agreement."  Id.

Next, the court analyzed the parties' risks, concluding that the lessee

"assumed the risk of damage, theft, * * * destruction", and depreciation, whereas

the lessor bore only the risk of the lessee's default, as would be true of a security

interest holder in a conditional sale.  See id. at 654.  Finally, the court in Swift

Dodge evaluated the parties' intentions, observing that their stated intention was to

engage in a lease arrangement.  See id.  Notwithstanding that stated intention, the

court concluded the leases were in fact conditional sales.  See id.

Our own caselaw reveals additional factors relevant to determining which

party under a purported lease bears the benefits and burdens of ownership.  These

include whether the leased property has a useful life that extends beyond the lease

term, and whether the strike price of any purchase option at the end of the lease

[*71] term is nominal relative to the total payments required under the purported lease. See Levy v. Commissioner, 91 T.C. 838, 860 (1988); Lockhart Leasing Co. v. Commissioner, 54 T.C. 301, 314-315 (1970), aff'd, 446 F.2d 269 (10th Cir. 1971); Bowen v. Commissioner, 12 T.C. at 461; cf. Rev. Proc. 2001-28, 2001-1 C.B. 1156 (providing guidelines for obtaining an advance ruling concerning the Federal tax treatment of purported leases); Rev. Rul. 55-540, 1955-2 C.B. 39 (listing factors the Commissioner considers in determining the Federal income tax treatment of equipment leases).

We begin with the parties' duties under the purported leases. Like the agreement in Swift Dodge, both the Marlin agreement and the Key agreement obliged CHMD, as the putative lessee, to insure the equipment and to bear the cost of all repairs and maintenance. The agreements additionally required CHMD to pay any and all taxes due on the equipment. Turning to the parties' rights, like the lessee in Swift Dodge, while Marlin and Key retained legal title to the equipment, CHMD was entitled to use it throughout the applicable term. It was also entitled under the Marlin agreement, and obliged under the Key agreement, to purchase the equipment for a specified nominal price at that term's conclusion.

Also like the lessee in Swift Dodge, CHMD bore the risks of damage, theft, and destruction: Both purported leases placed all responsibility for damage to the

[*72] equipment with CHMD and unconditionally required it to pay the full amount of all payments provided for therein. CHMD also bore the risk of depreciation. For tax purposes, both purported leases had five-year terms, and as qualified technological equipment, see sec. 168(e)(3)(B)(iv), (i)(2)(A)(i), the computers and peripheral items provided thereunder were five-year property and would thus have been fully depreciated under MACRS at the end of the agreements' terms. If the equipment were exhausted more quickly, CHMD would still be obliged to make all payments for it. If the equipment were exhausted more slowly, CHMD might be able to realize a gain by purchasing the equipment at the lease terms' conclusions or by continuing to use it in the medical practice.

Finally, like the agreement in Swift Dodge, the Marlin agreement recites the parties' intention that it be respected as a true lease; the Key agreement contains an analogous provision. But like the Court of Appeals in Swift Dodge, we do not consider these stated intentions dispositive in the light of the clearly contrary facts.

Those contrary facts also distinguish this case from Lockhart Leasing Co. v. Commissioner, 54 T.C. at 315, in which we rejected the Commissioner's arguments that alleged leases were sales. See also Nw. Acceptance Corp. v. Commissioner, 58 T.C. 836, 846-850 (1972) (on "nearly congruous" facts, refusing under Lockhart Leasing Co. to recharacterize an alleged lease as a conditional sale agreement),

[*73] aff'd, 500 F.2d 1222 (9th Cir. 1974). In Lockhart Leasing Co. v. Commissioner, 54 T.C. at 301-302, the taxpayer's "business activities consisted of the purchase of personal property for use of other persons" pursuant to an agreement titled as an equipment lease. As was true of Marlin, if not Key, the taxpayer would generally buy equipment specified in advance by a prospective lessee, then transfer it to the lessee. See id. at 302. Like the agreements here, the taxpayer's leases assigned the lessee all tax, insurance, and maintenance obligations as well as all liability for loss, theft, destruction, or damage of the equipment. See id. at 303-304. And like the Marlin agreement, the taxpayer's agreements often granted the lessee an option to purchase the equipment at the end of the lease. See id. at 306-307.

Yet in sharp contrast to the instant case, the taxpayer in Lockhart Leasing Co. did not prevent lessees from terminating their leases before the ends of their terms, and it re-leased or re-sold property returned to it. See id. at 302, 304. The Marlin and Key agreements unconditionally obligated CHMD to pay all amounts due under the leases, through the end of their terms. The Key agreement affirmatively required CHMD to buy the equipment. Although the Marlin agreement's purchase option appears not to have been obligatory, given the nature of the "leased" equipment (computers and peripheral equipment), we question

[*74] whether its useful life would have substantially exceeded the agreement's five-year term, such that Marlin could have re-leased or sold it had CHMD returned it after five years.

Further, the taxpayer in Lockhart Leasing Co. gave lessees the option to purchase relatively rarely, generally at a price equal to 10% of the equipment's original cost, and when no such option was given, it negotiated a purchase price at arm's length. See id. at 307, 315. Here, in contrast, the option prices were nominal--$101 under the Marlin agreement and $1 under the Key agreement. In any event, the nominal $101 purchase price more than offsets any useful life considerations given that the lessee, if it did not purchase the equipment, was required to return it to the lessor "in good working condition in a manner and to a location designated by" the lessor and to pay "any cost to refurbish the Equipment" incurred by the lessor. Although the record does not disclose the equipment's original cost to Marlin and Key, the payments unconditionally due under the agreements--$80,149 to Marlin and $85,274 to Key--so dwarfed the nominal strike prices that CHMD would almost surely have exercised the options. CHMD's ultimate acquisition of title was tantamount to a foregone conclusion.

Despite their labels, the purported leases were, in substance, installment sale agreements. With respect to both Marlin and Key, we conclude that the parties

[*75] contemplated from the beginning that CHMD would acquire outright ownership of the equipment after five years. We hold that CHMD assumed the benefits and burdens of ownership with respect to the equipment it acquired from Marlin and Key in January 2007, and that it was accordingly entitled to a depreciation deduction for that equipment.

For CHMD to claim that deduction under MACRS, it must establish its depreciable basis in the equipment. On its Form 1120S and on the depreciation schedule petitioners introduced, CHMD claimed a cost basis in the equipment of $64,010. CHMD's agreements with Marlin and Key do not disclose purchase prices or other values for the equipment, but they do provide for payments totaling, respectively, $80,149 and $85,274. Viewing the leases as installment sale agreements, these amounts must include both a profit and principal component--the equipment's purchase price, and hence CHMD's cost basis--and an interest component. Because the agreements are framed as leases, however, they do not disclose the interest rates imposed, so we cannot rely upon these totals to compute the principal due under each agreement.

On the record before the Court, CHMD plainly had some depreciable basis in the equipment and was entitled to claim a depreciation deduction, but CHMD has not definitively established that basis or the amount of the allowable

[*76] deduction.  The Court will therefore apply the Cohan rule.  Given the total amounts due under CHMD's agreements with Marlin and Key, and given the nature of the equipment acquired thereunder, the Court concludes that $64,010 is a reasonable computation of CHMD's depreciable basis in that equipment.  We will therefore allow a depreciation deduction of $12,802 as claimed by petitioners and redetermine respondent's determination to that extent.

D.    Summary

For those keeping score, petitioners have adequately substantiated, and CHMD was entitled to deduct, the following amounts of the disputed expenses:

| Expense | Amount at issue | Amount allowed |
|---|---|---|
| Salaries and wages | $111,138 | $82,913 |
| Rents | 80,300 | 77,858 |
| Interest | 80,099 | 3,918 |
| Depreciation | 41,122 | 12,802 |
| Other deductions | | |
| Supplies | 11,613 | -0- |
| Office | 36,258 | -0- |
| Dues and subscriptions | 6,401 | 4,551 |
| Contract labor | 9,970 | 7,180 |
| Auto and truck | 10,541 | -0- |
| Total | 387,442 | 189,222 |

**[\*77]** III.     Accuracy-Related Penalty

In the notice of deficiency respondent determined an accuracy-related penalty under section 6662(a) and (b)(1), (2), or (3) on the basis of negligence or disregard of rules and regulations, a substantial understatement of income tax, or a substantial valuation misstatement.[24]  As a general rule, the Commissioner bears the burden of production and "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty."  Higbee v. Commissioner, 116 T.C. 438, 446 (2001); see also sec. 7491(c).  Once respondent has met this burden of production, the burden will shift to petitioners to prove an affirmative defense or that they are otherwise not liable for the penalty.  See Higbee v. Commissioner, 116 T.C. at 446-447.

A.     Petitioners' Liability

Section 6662(a) and (b)(3) provides for imposition of a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to a substantial valuation misstatement.  For returns filed on or after August 17, 2006, as is relevant here, a substantial valuation misstatement occurs when "the value of any property (or the adjusted basis of any property) claimed on

---

[24]These represent alternative grounds for imposition of the penalty, as the accuracy-related penalties do not stack.  See sec. 1.6662-2(c), Income Tax Regs.

**[*78]** any return of tax imposed by chapter 1 is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)". Sec. 6662(e)(1)(A). The notice of deficiency does not explain what property's value or adjusted basis respondent believes petitioners misstated. Respondent did not discuss this issue at trial and has not addressed it on brief. As the Court can find no basis for this penalty in the record, we find petitioners not liable for the substantial valuation misstatement penalty.

Section 6662(a) and (b)(1) and (2) provides for imposition of a 20% penalty on the portion of an underpayment of tax attributable to negligence or disregard of rules and regulations or a substantial understatement of income tax. "'[N]egligence' includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]". Sec. 6662(c). It constitutes "'a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs. Disregard of rules and

**[\*79]** regulations "includes any careless, reckless, or intentional disregard of" the Code, regulations, or certain IRS administrative guidance. Id. subpara. (2). A substantial understatement of income tax as to an individual taxpayer is generally an understatement that exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

Whether a substantial understatement exists, and if so, in what amount, will depend upon the recalculation of petitioners' tax liability in the light of this opinion. Although we leave this calculation to the parties under Rule 155, it seems nearly certain, given the disallowance of more than $200,000 of petitioners' claimed passthrough loss from CHMD, see supra part II.D, that petitioners' understatement will exceed 10% of their tax liability, which will be greater than $5,000, and that the penalty will apply.

With regard to the negligence penalty, respondent contends that petitioners were negligent because they failed to maintain books and records sufficient to substantiate CHMD's income and expenses. We agree. As set forth at length supra, petitioners could not substantiate over half the amount of expenses remaining at issue. Similarly, although they claimed that $157,243 of CHMD's $171,177 of unreported deposits was nontaxable loan proceeds, they substantiated only a single loan, of $9,000. Petitioners offered no evidence or argument

[*80] concerning the balance of CHMD's unreported deposits, and they likewise attempted to substantiate only portions of CHMD's reported expenses. These substantiation failures constitute negligence for purposes of section 6662(a). See sec. 1.6662-3(b)(1), Income Tax Regs.

Dr. Holden's apparent lack of attention to his medical practice's finances exacerbated the dearth of documentary evidence concerning CHMD's income and expenses. For example, Dr. Holden testified that he recalled borrowing from Medware but knew nothing about the company and could not recall the amount of the loan or whether CHMD had repaid any of it. Granted, CHMD experienced severe financial difficulties during 2007 and, in Dr. Holden's words, was "borrowing from anyone." But we think that a reasonably prudent taxpayer whose wholly owned S corporation borrowed more than $100,000 from a third party would have at least some idea of how much was owed and whether any payments had been made.

Further, when petitioners' counsel asked Dr. Holden to examine CHMD's bank statements, he asserted that he had not, "to [his] * * * knowledge", run personal expenses through CHMD's business account. Yet petitioners themselves presented evidence that CHMD made two payments on Dr. Holden's Mercedes Benz. "[A]ttempt[s] to deduct personal expenses in contravention of the plain

[*81] language of section 262 constitute[] negligence." Bond v. Commissioner, T.C. Memo. 2012-313, at *13-*14 (fn. ref. omitted); accord, e.g., Cor v. Commissioner, T.C. Memo. 2013-240, at *8; WSB Liquidating Corp. v. Commissioner, T.C. Memo. 2001-9, 81 T.C.M. (CCH) 1007, 1012 (2001).

Respondent has satisfied his burden of production with regard to the negligence penalty, so we turn to petitioners' defense.

B.    Petitioners' Defense[25]

Section 6664(c) generally provides a defense to the section 6662(a) penalty with respect to any portion of an underpayment of tax for which the taxpayer had reasonable cause and with respect to which the taxpayer acted in good faith. "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Id.

---

[25]Petitioners did not raise an affirmative defense to the sec. 6662(a) penalty in their petition. Ordinarily, an affirmative defense not pleaded "is deemed to be waived." Gustafson v. Commissioner, 97 T.C. 85, 90 (1991). Because respondent has not objected, however, and because both parties address the defense in their briefs, we will treat it as an issue tried by implied consent of the parties under Rule 41(b)(1).

[*82] On brief, petitioners contend, generally, that they have shown reasonable cause for the underpayment set forth in the notice of deficiency. They assert that they maintained books and records adequate to properly substantiate CHMD's expenses and exercised due care in filing their tax returns. On the record before us, we interpret these assertions as references to CHMD's loss of documents in the 2009 flood.[26]

---

[26]A taxpayer may establish a sec. 6664(c) reasonable cause defense by showing that he or she relied reasonably and in good faith on a third party's advice in taking the disputed tax position. See sec. 1.6664-4(c), Income Tax Regs. We have held that, to establish this variation of the defense, "the taxpayer must prove * * * that * * * : (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting three-prong test in Neonatology Assocs. with approval), aff'g 121 T.C. 89 (2003), supplemented by T.C. Memo. 2004-43.

Petitioners have not raised a reasonable reliance defense, and the record would not support it. Dr. Holden testified that Ashley Hallsman, a certified public accountant with Hallsman Accountancy Corp. who had prepared CHMD's Federal income tax returns for at least five years, prepared its 2007 return, as the tax return itself indicates. Even assuming, arguendo, that Ms. Hallsman's certified public accountant (C.P.A.) credential and five or more years of experience rendered her a competent professional with sufficient expertise to justify reliance, it is unclear what information petitioners or CHMD's staff provided to her or whether petitioners relied in good faith upon her advice.

**[*83]** Petitioners established that CHMD did maintain records of its expenses. Ms. Garcia entered bills into Quickbooks as payables upon receipt, updated the entries to reflect payment when she wrote checks or made online payments, and maintained hard copy records with annotations in vendor-specific folders. An independent third party reviewed and verified quarterly her classifications of CHMD's expenses within various available Quickbooks categories. CHMD used a payroll processing company, ADP, to prepare its payroll checks. For each pay period, Ms. Garcia would telephone ADP to report the hours worked by each employee and independent contractor on CHMD's payroll. ADP would then prepare and deliver the payroll checks to CHMD, to be signed and then disbursed to the staff.

Petitioners further established that, on or around December 13, 2009, a pipe broke in the area of the Orange office where Dr. Holden's and Ms. Garcia's desks, Dr. Holden's books, medical records, computers, billing records, and records of CHMD's debts were located. At the request of Dr. Holden's bankruptcy trustee, Mr. Rhondo had earlier placed documents and hard drives detailing the past five years of CHMD's income and expenses against a wall of Dr. Holden's office. The pipe broke directly above, drenching and thus destroying many of the records.

**[*84]** On other facts, we might find that destruction of records in a flood provides reasonable cause for deficient substantiation. See, e.g., Burkart v. Commissioner, T.C. Memo. 1984-429, 48 T.C.M. (CCH) 867, 869 (1984) (where the taxpayers established that their books and records were lost in a flood, finding that the taxpayers were not liable for the negligence penalty under the predecessor statute of section 6662). But see, e.g., Nguyen v. Commissioner, T.C. Memo. 2014-199, at *3, *8-*11 (where the taxpayer established that he lost bills and receipts in a flood, nevertheless finding that the taxpayer was liable for the accuracy-related penalty). We decline to do so here for at three reasons.

First, although petitioners did make some effort to reconstruct their lost records, that effort was haphazard. On one hand, petitioners successfully substantiated with secondary evidence most of the equipment rental expense claimed on CHMD's return. On the other hand, petitioners utterly failed to substantiate various expenses paid with credit cards as well as interest paid to credit card providers. The record contains only a single page from a single statement for one credit card, which appears to be Dr. Holden's personal card. Petitioners did not retrieve from Advanta, American Express, Platinum Plus, or any other credit card provider records of CHMD's purchases. In addition,

[*85] petitioners offered no explanation whatsoever for more than $34,000 of reported salaries and wage expenses.

Second, even had CHMD's complete books and records been available and all its reported expenses substantiated, some of CHMD's deductions would still have been disallowed. For example, petitioners' own evidence established that, on at least two occasions, CHMD paid Dr. Holden's car payment. Absent any evidence that Dr. Holden used his vehicle strictly for work-related travel (other than commuting), which on the existing record we find implausible, these expenditures were not business expenses deductible under sections 162 and 274(d).

Third and finally, in determining whether a taxpayer acted with reasonable cause and in good faith, the principal consideration "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Sec. 1.6664-4(b)(1), Income Tax Regs. On the record before us, petitioners appear to have made virtually no such effort. Dr. Holden testified only that he relied upon a C.P.A. to prepare CHMD's tax returns. His statements revealed a surprising lack of knowledge concerning CHMD's finances and tax reporting. Petitioners offered no evidence that they reviewed the returns Ms. Hallsman prepared or strove to understand, even at a very general level, the positions taken therein.

**[\*86]** For the foregoing reasons, we conclude that petitioners have not carried their burden of establishing the reasonable cause and good faith defense to the section 6662(a) negligence (or substantial understatement) penalty. Consequently, the are liable for the penalty with respect to the entirety of their underpayment of tax, as computed in accordance with this opinion.

The Court has considered all of the parties' contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

Decision will be entered under

Rule 155.

- 87 -

[*87]                    APPENDIX A

| Salary Payments Substantiated by Ex. 18-P |

| Ex. 18-P page No. | Check date | Check No. | Payee | Amount | Ex. 5-P page No. | Date posted |
|---|---|---|---|---|---|---|
| 1 | 4/6/2007 | 608 | Depinder Mann | $3,500.00 | 29 | 4/11/2007 |
| 2 | 4/20/2007 | 621 | Depinder Mann | 3,500.00 | 31 | 4/23/2007 |
| 3 | 3/23/2007 | 598 | Depinder Mann | 3,500.00 | 24 | 3/28/2007 |
| 4 | 3/9/2007 | 588 | Depinder Mann | 3,500.00 | 22 | 3/14/2007 |
| 5 | 2/23/2007 | 577 | Depinder Mann | 3,500.00 | 19 | 3/2/2007 |
| 6 | 2/9/2007 | 566 | Depinder Mann | 3,500.00 | 14 | 2/14/2007 |
| 7 | 1/26/2007 | 555 | Depinder Mann | 3,500.00 | 9 | 1/30/2007 |
| 8 | 1/12/2007 | 543 | Depinder Mann | 3,500.00 | 6 | 1/16/2007 |
|  |  |  |  | 28,000.00 |  |  |
|  |  |  |  |  |  |  |
| 9 | 1/26/2007 | 553 | Edward M Andujar | 2,000.00 | 9 | 1/29/2007 |
| 10 | 1/12/2007 | 541 | Edward M Andujar | 2,000.00 | 5 | 1/12/2007 |
|  |  |  |  | 4,000.00 |  |  |
|  |  |  |  |  |  |  |
| 11 | 4/20/2007 | 620 | Donna Do | 602.00 | 31 | 4/24/2007 |
| 12 | 4/6/2007 | 607 | Donna Do | 646.00 | 29 | 4/11/2007 |
| 13 | 2/9/2007 | 565 | Donna Do | 1,118.00 | 29 | 4/11/2007 |
| 14 | 3/23/2007 | 597 | Donna Do | 823.20 | 29 | 4/11/2007 |
| 15 | 3/9/2007 | 587 | Donna Do | 1,257.60 | 29 | 4/11/2007 |
| 16 | 2/23/2007 | 576 | Donna Do | 1,405.60 | 29 | 4/11/2007 |
| 17 | 1/26/2007 | 554 | Donna Do | 1,393.60 | 21 | 3/9/2007 |
| 18 | 1/12/2007 | 542 | Donna Do | 1,509.20 | 14 | 2/12/2007 |
|  |  |  |  | 8,755.20 |  |  |
|  |  |  |  |  |  |  |
| 19 | 1/12/2007 | 545 | Ninpapha Niangnouansy | 1,183.14 | 6 | 1/16/2007 |
| 20 | 1/26/2007 | 557 | Ninpapha Niangnouansy | 1,440.00 | 9 | 1/30/2007 |
| 21 | DUPLICATE OF PAGE 20 |  |  |  |  |  |
| 22 | 2/9/2007 | 568 | Ninpapha Niangnouansy | 1,855.61 | 14 | 2/13/2007 |
| 23 | 2/23/2007 | 579 | Ninpapha Niangnouansy | 1,440.00 | 19 | 3/2/2007 |
| 24 | 3/9/2007 | 590 | Ninpapha Niangnouansy | 1,440.00 | 21 | 3/12/2007 |
| 25 | 3/23/2007 | 600 | Ninpapha Niangnouansy | 1,440.00 | 24 | 3/28/2007 |
| 26 | 4/6/2007 | 610 | Ninpapha Niangnouansy | 1,440.00 | 29 | 4/10/2007 |
| 27 | 5/18/2007 | 631 | Ninpapha Niangnouansy | 1,440.00 | 37 | 5/21/2007 |
| 28 | 6/15/2007 | 642 | Ninpapha Niangnouansy | 1,440.00 | 44 | 6/20/2007 |
| 29 | 6/29/2007 | 648 | Ninpapha Niangnouansy | 1,600.00 | 47 | 7/2/2007 |

[*88]

| 30 | 7/13/2007 | 653 | Ninpapha Niangnouansy | 1,600.00 | 49 | 7/16/2007 |
|---|---|---|---|---|---|---|
| 31 | 7/27/2007 | 658 | Ninpapha Niangnouansy | 1,600.00 | 51 | 7/30/2007 |
| 32 | 8/10/2007 | 662 | Ninpapha Niangnouansy | 1,600.00 | 54 | 8/14/2007 |
| 33 | 8/24/2007 | 667 | Ninpapha Niangnouansy | 1,600.00 | 56 | 8/28/2007 |
| 34 | 9/7/2007 | 671 | Ninpapha Niangnouansy | 1,600.00 | 60 | 9/10/2007 |
| 35 | 9/21/2007 | 675 | Ninpapha Niangnouansy | 1,600.00 | 62 | 9/25/2007 |
| 36 | 10/5/2007 | 679 | Ninpapha Niangnouansy | 1,820.00 | 65 | 10/10/2007 |
| 37 | 10/19/2007 | 683 | Ninpapha Niangnouansy | 1,600.00 | 67 | 10/23/2007 |
| 38 | 11/2/2007 | 687 | Ninpapha Niangnouansy | 1,600.00 | 71 | 11/6/2007 |
| 39 | 11/16/2007 | 691 | Ninpapha Niangnouansy | 1,600.00 | 73 | 11/21/2007 |
| 40 | 11/30/2007 | 694 | Ninpapha Niangnouansy | 1,600.00 | 76 | 12/5/2007 |
| 41 | 12/14/2007 | 695 | Ninpapha Niangnouansy | 1,700.00 | 78 | 12/18/2007 |
| | | | | 34,238.75 | | |
| | | | | | | |
| 42 | 12/29/2006 | 528 | Jennifer M. Rivera | 359.84 | 57 | 8/30/2007 |
| | | | | | | |
| | TOTAL | | | 75,353.79 | | |
| | Less 2006 Items | | | -$359.84 | | |
| | NET TOTAL | | | 74,993.95 | | |

[*89]                                        APPENDIX B

| Ex. 19-P page No. | Date accrued | Payee | Check No. | Lease charge amount | Ex. 11-P page No. | Finance charge amount | Ex. 11-P page No. | Insur. amount | Ex. 11-P page No. | Sales tax amount | Ex. 11-P page No. | Security mon. amount | Ex. 11-P page No. | Total payment | Ex. 5-J page No. | Date cleared |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |
| 3 | 1/2/2007 | HPSC | B492 | $711.33 | 24 | | | | | | | | | $711.33 | 4 | 1/8/2007 |
| | 1/2/2007 | GE / HPSC | B493 | 1,543.51 | 24 | | | | | $119.62 | 53 | | | 2,508.61 | | |
| | 1/2/2007 | GE / HPSC | B493 | 845.48 | 24 | | | | | | | | | | | |
| 1 | 1/2/2007 | Lfg | | 55.30 | 24 | | | | | | | | | 55.30 | 2 | 1/2/2007 |
| 1 | 1/2/2007 | Mbf Leasing | | 91.14 | 24 | | | | | | | | | 91.14 | 2 | 1/2/2007 |
| 1 | 1/2/2007 | Mbf Leasing | | 91.14 | 24 | | | | | | | | | 91.14 | 2 | 1/2/2007 |
| 4 | 1/5/2007 | IFC Credit Corp. | B540 | 174.68 | 24 | | | | | | | | | 174.68 | 5 | 1/10/2007 |
| 5 | 1/5/2007 | IFC Credit Corp. | B541 | 43.57 | 24 | | | | | | | | | 43.57 | 5 | 1/10/2007 |
| 6 | 1/5/2007 | IFC Credit Corp. | B542 | 163.39 | 24 | | | | | | | | | 163.39 | 5 | 1/10/2007 |
| | 1/22/2007 | Great America | B570 | 327.56 | 24 | | | $15.56 | 28 | | | | | 343.12 | 7 | 1/22/2007 |
| | 1/26/2007 | GE / HPSC | B588 | 592.61 | 24 | $99.00 | 31 | | | | | | | 691.61 | 9 | 1/26/2007 |
| | 1/26/2007 | GE / HPSC | B589 | 1,543.51 | 24 | | | | | 119.62 | 53 | | | 2,508.61 | 9 | 1/26/2007 |
| | 1/26/2007 | GE / HPSC | B589 | 845.48 | 24 | | | | | | | | | | | |
| | 1/26/2007 | GE / HPSC | B590 | 884.03 | 24 | | | | | | | | | 884.03 | 9 | 1/26/2007 |
| | 1/26/2007 | HPSC | B591 | 2,730.77 | 24 | | | | | | | | | 2,730.77 | 9 | 1/26/2007 |
| 2 | 1/29/2007 | Protection One | B599 | 108.24 | 24 | | | | | 8.39 | 53 | $77.61 | | 194.24 | 9 | 1/29/2007 |
| 2 | 1/29/2007 | Protection One | B600 | 107.82 | 24 | | | | | 8.36 | 53 | 78.03 | | 194.21 | 9 | 1/29/2007 |
| 7 | 2/1/2007 | Mbf Leasing | 2090 | 91.14 | 24 | | | | | | | | | 91.14 | 12 | 2/1/2007 |
| 7 | 2/1/2007 | Mbf Leasing | 2091 | 91.14 | 24 | | | | | | | | | 91.14 | 12 | 2/1/2007 |
| 7 | 2/2/2007 | Lfg | 2092 | 55.30 | 24 | | | | | | | | | 55.30 | 12 | 2/2/2007 |

Payments to Leasing Companies Identified in Exhibit 19-P

[*90]

| | Date | Company | Inv. | Amount | | Amount | | | Amount | | Amount | | Total | | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 2/5/2007 | IFC Credit Corp. | 2166 | 174.68 | 24 | | | | | | | | 174.68 | 14 | 2/12/2007 |
| 15 | 2/5/2007 | IFC Credit Corp. | 2167 | 163.39 | 24 | | | | | | | | 163.39 | 14 | 2/12/2007 |
| 8 | 2/7/2007 | GE / HPSC | 2147 | 1,543.51 | 24 | 154.35 | 31 | | | | 119.62 | 53 | 2,747.51 | 14 | 2/13/2007 |
| 8 | 2/7/2007 | GE / HPSC | 2147 | 845.48 | 25 | 84.55 | 31 | | | | | | | | |
| 9 | 2/7/2007 | GE / HPSC | 2148 | 592.61 | 24 | 60.77 | 31 | | | | | | 653.38 | 14 | 2/13/2007 |
| 10 | 2/7/2007 | GE / HPSC | 2149 | 983.03 | 24 | 88.40 | 31 | | | | | | 1,071.43 | 14 | 2/13/2007 |
| 11 | 2/7/2007 | HPSC | 2150 | 1,308.95 | 24 | | | | | | | | 1,308.95 | 14 | 2/13/2007 |
| 12 | 2/7/2007 | Great America | 2153 | 288.63 | 24 | | | | | | | | 288.63 | 14 | 2/13/2007 |
| 13 | 2/7/2007 | Great America | 2154 | 263.50 | 25 | | | | | | | | 263.50 | 14 | 2/13/2007 |
| 16 | 2/15/2007 | Banc of America | 2201 | 537.68 | 25 | 35.02 | $31.00 | | | | | | 1,145.39 | 20 | 3/5/2007 |
| 16 | 2/15/2007 | Banc of America | 2201 | 537.67 | 25 | 35.02 | $31.00 | | | | | | | | |
| 17 | 2/16/2007 | Great America | 2204 | 327.56 | 25 | | | 15.56 | 28 | | | | 343.12 | 19 | 3/2/2007 |
| 25 | 3/1/2007 | Mbf Leasing | | 91.14 | 25 | | | | | | | | 91.14 | 19 | 3/1/2007 |
| 25 | 3/1/2007 | Mbf Leasing | | 91.14 | 25 | | | | | | | | 91.14 | 19 | 3/1/2007 |
| | 3/1/2007 | GE / HPSC | 2235 | 983.03 | 25 | 99.63 | 31 | | | | | | 1,082.66 | 20 | 3/6/2007 |
| | 3/1/2007 | GE / HPSC | 2236 | 1,543.51 | 25 | 156.67 | 31 | | | | 119.62 | 53 | 2,751.10 | 20 | 3/6/2007 |
| | 3/1/2007 | GE / HPSC | 2237 | 493.61 | 25 | 50.40 | 31 | | | | | | 544.01 | 20 | 3/6/2007 |
| | 3/1/2007 | GE / HPSC | 2236 | 845.48 | 25 | 85.82 | 31 | | | | | | | | |
| 25 | 3/2/2007 | Lfg | | 55.30 | 25 | | | | | | | | 55.30 | 19 | 3/2/2007 |
| 21 | 3/3/2007 | Great America | 2247 | 288.63 | 25 | | | | | | | | 288.63 | 22 | 3/14/2007 |
| 20 | 3/3/2007 | Great America | 2248 | 263.50 | 25 | | | | | | | | 263.50 | 22 | 3/14/2007 |
| 18 | 3/8/2007 | IFC Credit Corp. | 2258 | 210.48 | 25 | | | | | | | | 210.48 | 21 | 3/12/2007 |
| 19 | 3/8/2007 | IFC Credit Corp. | 2259 | 187.90 | 25 | | | | | | | | 187.90 | 21 | 3/12/2007 |
| 23 | 3/15/2007 | Banc of America | 2264 | 537.68 | 25 | | | | | | | | 1,075.35 | 23 | 3/19/2007 |

[*91]

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23 | 3/15/2007 | Banc of America | 2264 | 537.67 | 25 | | | | | | | | | | | |
| 22 | 3/16/2007 | Great America | 2267 | 327.56 | 25 | 36.96 | 31 | 15.56 | 28 | | | | | 380.08 | 23 | 3/19/2007 |
| 24 | 3/31/2007 | Compare Business Services | 2300 | 835.99 | 25 | | | | | | | | | 835.99 | 24 | 3/30/2007 |
| 28 | 4/2/2007 | IFC Credit Corp. | 2308 | 210.48 | 25 | | | | | | | | | 210.48 | 28 | 4/6/2007 |
| 29 | 4/2/2007 | IFC Credit Corp. | 2309 | 187.90 | 25 | | | | | | | | | 187.90 | 28 | 4/6/2007 |
| 34 | 4/2/2007 | Mbf Leasing | | 91.14 | 25 | | | | | | | | | 91.14 | 27 | 4/2/2007 |
| 34 | 4/2/2007 | Mbf Leasing | | 91.14 | 25 | | | | | | | | | 91.14 | 27 | 4/2/2007 |
| 34 | 4/2/2007 | Lfg | | 55.30 | 25 | | | | | | | | | 55.30 | 27 | 4/2/2007 |
| 27 | 4/4/2007 | GE / HPSC | 2317 | 1,543.51 | 25 | | | | | 119.62 | 53 | | | 2,508.61 | 29 | 4/10/2007 |
| 27 | 4/4/2007 | GE / HPSC | 2317 | 845.48 | 25 | | | | | | | | | | | |
| 33 | 4/6/2007 | Great America | 3613 | 288.63 | 25 | | | | | | | | | 288.63 | 28 | 4/6/2007 |
| 32 | 4/9/2007 | Great America | 3620 | 263.50 | 25 | | | | | | | | | 263.50 | 29 | 4/9/2007 |
| 26 | 4/10/2007 | Protection One | 2325 | 107.82 | 25 | | | | | 8.36 | 53 | 78.03 | 36 | 194.21 | 29 | 4/10/2007 |
| 30 | 4/10/2007 | GE / HPSC | 2315 | 592.61 | 25 | | | | | | | | | 592.61 | 29 | 4/10/2007 |
| 31 | 4/10/2007 | GE / HPSC | 2316 | 983.03 | 25 | | | | | | | | | 983.03 | 29 | 4/10/2007 |
| | 4/16/2007 | Banc of America | 3708 | 537.67 | 25 | 49.90 | 31 | 13.12 | 28 | | | | | 1,201.38 | 30 | 4/16/2007 |
| | 4/16/2007 | Banc of America | 3708 | 537.67 | 25 | 49.91 | 31 | 13.11 | 28 | | | | | | | |
| | 4/16/2007 | Great America | 3709 | 327.56 | 25 | 36.96 | 31 | 15.56 | 28 | | | | | 380.08 | 30 | 4/16/2007 |
| | 5/1/2007 | GE / HPSC | 3718 | 592.61 | 25 | | | | | | | | | 592.61 | 34 | 5/1/2007 |
| | 5/1/2007 | GE / HPSC | 3714 | 983.03 | 25 | | | | | | | | | 983.03 | 34 | 5/1/2007 |
| | 5/1/2007 | GE / HPSC | 3719 | 1,543.51 | 25 | | | | | 119.62 | 53 | | | 2,508.61 | 34 | 5/1/2007 |
| 35 | 5/1/2007 | Mbf Leasing | | 91.14 | 25 | | | | | | | | | 91.14 | 34 | 5/1/2007 |
| 35 | 5/1/2007 | Mbf Leasing | | 91.14 | 25 | | | | | | | | | 91.14 | 34 | 5/1/2007 |
| | 5/1/2007 | GE / HPSC | 3719 | 845.48 | 25 | | | | | | | | | | | |
| 35 | 5/2/2007 | Lfg | | 55.30 | 25 | | | | | | | | | 55.30 | 34 | 5/2/2007 |
| 36 | 5/7/2007 | Great America | 3614 | 288.63 | 25 | | | | | | | | | 288.63 | 35 | 5/7/2007 |

[*92]

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | 5/7/2007 | Great America | B621 | 263.50 | 25 | | | | | | | 263.50 | 35 | 5/7/2007 |
| 36 | 5/7/2007 | IFC Credit Corp. | B775 | 185.97 | 25 | | | | | | | 185.97 | 35 | 5/7/2007 |
| 36 | 5/7/2007 | IFC Credit Corp. | B776 | 163.39 | 25 | | | | | | | 163.39 | 35 | 5/7/2007 |
| 37 | 5/14/2007 | Protection One | B804 | 108.24 | 25 | | | 8.39 | 53 | 77.61 | 36 | 194.24 | 36 | 5/14/2007 |
| 43 | 5/15/2007 | Banc of America | B807 | 1,075.35 | 25 | 26.23 | 28 | | | | | 1,101.58 | 36 | 5/16/2007 |
| 38 | 5/18/2007 | Great America | B769 | 350.81 | 26 | | | | | | | 350.81 | 37 | 5/18/2007 |
| 38 | 5/18/2007 | Great America | B770 | 320.28 | 26 | | | | | | | 320.28 | 37 | 5/18/2007 |
| 38 | 5/21/2007 | Great America | B648 | 327.56 | 26 | 15.56 | 28 | | | | | 343.12 | 37 | 5/21/2007 |
| | 6/1/2007 | GE / HPSC | B761 | 1,543.51 | 26 | | | 119.62 | 53 | | | 2,508.61 | 42 | 6/7/2007 |
| | 6/1/2007 | GE / HPSC | B760 | 983.03 | 26 | | | | | | | 983.03 | 42 | 6/7/2007 |
| | 6/1/2007 | GE / HPSC | B762 | 592.61 | 26 | | | | | | | 592.61 | 42 | 6/7/2007 |
| | 6/1/2007 | GE / HPSC | B761 | 845.48 | 26 | | | | | | | | | |
| 39 | 6/4/2007 | Great America | B841 | 377.06 | 26 | | | | | | | 377.06 | 41 | 6/4/2007 |
| 39 | 6/4/2007 | Great America | B842 | 412.99 | 26 | | | | | | | 412.99 | 41 | 6/4/2007 |
| 39 | 6/4/2007 | Lfg | | 55.30 | 26 | | | | | | | 55.30 | 41 | 6/4/2007 |
| 40 | 6/7/2007 | Mbf Leasing | | 91.14 | 26 | | | | | | | 91.14 | 42 | 6/7/2007 |
| 40 | 6/7/2007 | Mbf Leasing | | 91.14 | 26 | | | | | | | 91.14 | 42 | 6/7/2007 |
| 40 | 6/8/2007 | Mbf Leasing | | 32.74 | 26 | | | | | | | 32.74 | 42 | 6/8/2007 |
| 40 | 6/8/2007 | Mbf Leasing | | 32.74 | 26 | | | | | | | 32.74 | 42 | 6/8/2007 |
| 41 | 6/11/2007 | IFC Credit Corporation | B849 | 185.97 | 26 | | | | | | | 185.97 | 43 | 6/13/2007 |
| 42 | 6/11/2007 | IFC Credit Corp. | B850 | 163.39 | 26 | | | | | | | 163.39 | 43 | 6/13/2007 |
| 43 | 6/15/2007 | Banc of America | B809 | 1,075.35 | 26 | 26.23 | 28 | | | | | 1,101.58 | 43 | 6/18/2007 |
| 44 | 6/15/2007 | Great America | B866 | 327.56 | 26 | 15.56 | 28 | | | | | 343.12 | 44 | 6/21/2007 |
| | 7/2/2007 | Lfg | | 55.30 | 26 | | | | | | | 55.30 | 47 | 7/2/2007 |
| | 7/2/2007 | Mbf Leasing | | 91.14 | 26 | | | | | | | 91.14 | 47 | 7/2/2007 |
| | 7/2/2007 | Mbf Leasing | | 91.14 | 26 | | | | | | | 91.14 | 47 | |
| 48 | 7/3/2007 | GE / HPSC | B858 | 1,543.51 | 26 | | | 119.62 | 53 | | | 2,508.61 | 48 | 7/10/2007 |

**[*93]**

| | Date | Creditor | Check | Amount | | | | | | | | | | Total | | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | 7/3/2007 | GE / HPSC | 8857 | 983.03 | 26 | | | | | | | | | 983.03 | 48 | 7/10/2007 |
| 49 | 7/3/2007 | GE / HPSC | 8859 | 592.61 | 26 | | | | | | | | | 592.61 | 48 | 7/10/2007 |
| 48 | 7/3/2007 | GE / HPSC | 8858 | 845.48 | 26 | | | | | | | | | | | |
| 46 | 7/5/2007 | IFC Credit Corp. | 8893 | 210.48 | 26 | | | | | | | | | 210.48 | 48 | 7/6/2007 |
| 45 | 7/5/2007 | IFC Credit Corp. | 8895 | 187.90 | 26 | | | | | | | | | 187.90 | 48 | 7/6/2007 |
| | 7/6/2007 | Protection One | 8915 | 108.24 | 26 | | | | | 8.39 | 53 | 77.61 | 36 | 194.24 | 48 | 7/6/2007 |
| 50 | 7/9/2007 | Great America | 8619 | 288.63 | 26 | | | | | | | | | 288.63 | 48 | 7/10/2007 |
| 51 | 7/9/2007 | Great America | 8623 | 263.50 | 26 | | | | | | | | | 263.50 | 48 | 7/10/2007 |
| | 7/11/2007 | Protection One | 8917 | 107.82 | 26 | | | | | 8.36 | 53 | 78.03 | 36 | 194.21 | 48 | 7/11/2007 |
| 52 | 7/16/2007 | Banc of America | 8808 | 1,075.35 | 26 | | | 26.23 | 28 | | | | | 1,101.58 | 49 | 7/17/2007 |
| 53 | 7/16/2007 | Great America | 8933 | 327.56 | 26 | 73.92 | 32 | 15.56 | 28 | | | | | 417.04 | 49 | 7/19/2007 |
| 55 | 8/1/2007 | GE / HPSC | 8924 | 983.03 | 26 | | | | | | | | | 983.03 | 53 | 8/2/2007 |
| 56 | 8/1/2007 | GE / HPSC | 8926 | 1,543.51 | 26 | | | | | 119.62 | 53 | | | 2,508.61 | 53 | 8/2/2007 |
| 57 | 8/1/2007 | GE / HPSC | 8928 | 592.61 | 26 | | | | | | | | | 592.61 | 53 | 8/2/2007 |
| 64 | 8/1/2007 | Mbf Leasing | | 91.14 | 26 | | | | | | | | | 91.14 | 52 | 8/1/2007 |
| 65 | 8/1/2007 | Mbf Leasing | | 91.14 | 26 | | | | | | | | | 91.14 | 53 | 8/1/2007 |
| 56 | 8/1/2007 | GE / HPSC | 8926 | 845.48 | 26 | | | | | | | | | | | |
| 65 | 8/2/2007 | Lfg | | 55.30 | 26 | | | | | | | | | 55.30 | 53 | 8/2/2007 |
| 58 | 8/3/2007 | IFC Credit Corp. | 8973 | 163.39 | 26 | | | | | | | | | 163.39 | 54 | 8/8/2007 |
| 59 | 8/3/2007 | IFC Credit Corp. | 8972 | 185.97 | 26 | | | | | | | | | 185.97 | 54 | 8/8/2007 |
| 65 | 8/3/2007 | GE / HPSC | | 149.00 | 26 | | | | | | | | | 149.00 | 53 | 8/2/2007 |
| 61 | 8/7/2007 | Great America | 8617 | 288.63 | 26 | | | | | | | | | 288.63 | 55 | 8/14/2007 |
| 60 | 8/7/2007 | Great America | 8625 | 263.50 | 26 | | | | | | | | | 263.50 | 55 | 8/14/2007 |
| 62 | 8/15/2007 | Banc of America | 8810 | 1,075.35 | 26 | | | 26.23 | 28 | | | | | 1,101.58 | 55 | 8/16/2007 |

[*94]

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 63 | 8/16/2007 | Great America | 8867 | 327.56 | 26 | | | 15.56 | 28 | | | | | 343.12 | 55 | 8/21/2007 |
| 70 | 9/4/2007 | GE / HPSC | 8927 | 592.61 | 26 | | | | | | | | | 592.61 | 60 | 9/7/2007 |
| 66 | 9/4/2007 | Great America | 8955 | 288.63 | 26 | | | | | | | | | 288.63 | 59 | 9/5/2007 |
| 67 | 9/4/2007 | Great America | 8956 | 263.50 | 27 | | | | | | | | | 263.50 | 59 | 9/5/2007 |
| 71 | 9/4/2007 | GE / HPSC | 8988 | 1,543.51 | 27 | | | | | 119.62 | 53 | | | 1,663.13 | 60 | 9/7/2007 |
| 83 | 9/4/2007 | Lfg | | 55.30 | 27 | | | | | | | | | 55.30 | 59 | 9/4/2007 |
| 83 | 9/4/2007 | Mbf Leasing | | 91.14 | 27 | | | | | | | | | 91.14 | 59 | 9/4/2007 |
| 83 | 9/4/2007 | Mbf Leasing | | 91.14 | 27 | | | | | | | | | 91.14 | 59 | 9/4/2007 |
| 69 | 9/5/2007 | IFC Credit Corp. | 9072 | 185.97 | 27 | | | | | | | | | 185.97 | 59 | 9/6/2007 |
| 68 | 9/5/2007 | IFC Credit Corp. | 9073 | 163.39 | 27 | | | | | | | | | 163.39 | 59 | 9/6/2007 |
| 72 | 9/14/2007 | Banc of America | 8929 | 1,075.35 | 27 | | | 26.23 | 28 | | | | | 1,101.58 | 61 | 9/17/2007 |
| 73 | 9/14/2007 | Great America | 9105 | 327.56 | 27 | 36.96 | 32 | 15.56 | 28 | | | | | 380.08 | 61 | 9/24/2007 |
| 75 | 10/1/2007 | GE / HPSC | 8982 | 592.61 | 27 | | | | | | | | | 592.61 | 64 | 10/2/2007 |
| 74 | 10/1/2007 | GE / HPSC | 9083 | 1,543.51 | 27 | | | | | 119.62 | 53 | | | 1,663.13 | 64 | 10/2/2007 |
| 80 | 10/1/2007 | Mbf Leasing | | 91.14 | 27 | | | | | | | | | 91.14 | 64 | 10/1/2007 |
| 80 | 10/1/2007 | Mbf Leasing | | 91.14 | 27 | | | | | | | | | 91.14 | 64 | 10/1/2007 |
| 80 | 10/2/2007 | Lfg | | 55.30 | 27 | | | | | | | | | 55.30 | 64 | 10/2/2007 |
| 76 | 10/3/2007 | Great America | 9055 | 288.63 | 27 | | | | | | | | | 288.63 | 65 | 10/4/2007 |
| 77 | 10/3/2007 | Great America | 9058 | 263.50 | 27 | | | | | | | | | 263.50 | 65 | 10/4/2007 |
| 79 | 10/5/2007 | IFC Credit Corp. | 9130 | 185.97 | 27 | | | | | | | | | 185.97 | 66 | 10/11/2007 |
| 78 | 10/5/2007 | IFC Credit Corp. | 9129 | 163.39 | 27 | | | | | | | | | 163.39 | 66 | 10/11/2007 |
| 81 | 10/9/2007 | Protection One | 9140 | 108.24 | 27 | | | | | 8.39 | 53 | 77.61 | 36 | 194.24 | 65 | 10/9/2007 |
| 82 | 10/11/2007 | Protection One | 9141 | 107.82 | 27 | | | | | 8.36 | 53 | 78.03 | 37 | 194.21 | 66 | 10/11/2007 |
| | 10/25/2007 | Great America | 2496 | 327.56 | 27 | | | 15.56 | 28 | | | | | 343.12 | 68 | 10/30/2007 |
| 85 | 11/1/2007 | GE / HPSC | 2526 | 1,543.51 | 27 | | | | | 119.62 | 53 | | | 1,663.13 | 70 | 11/2/2007 |

[*95]

| 84 | 11/1/2007 | GE / HPSC | 2527 | 592.61 | 27 | | | | | | | | | 592.61 | 69 | 11/1/2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 93 | 11/1/2007 | Mbf Leasing | | 91.14 | 27 | | | | | | | | | 91.14 | 70 | 11/1/2007 |
| 93 | 11/1/2007 | Mbf Leasing | | 91.14 | 27 | | | | | | | | | 91.14 | 70 | 11/1/2007 |
| 93 | 11/2/2007 | Lfg | | 55.30 | 27 | | | | | | | | | 55.30 | 70 | 11/2/2007 |
| | 11/5/2007 | IFC Credit Corp. | 2548 | 185.97 | 27 | | | | | | | | | 185.97 | 70 | 11/5/2007 |
| 86 | 11/5/2007 | IFC Credit Corp. | 2549 | 163.39 | 27 | | | | | | | | | 163.39 | 70 | 11/5/2007 |
| 88 | 11/15/2007 | Banc of America | 2578 | 1,075.35 | 27 | 99.80 | 33 | 26.23 | 28 | | | | | 1,201.38 | 73 | 11/20/2007 |
| 87 | 11/15/2007 | Banc of America | 2579 | 1,423.95 | 27 | | | 26.23 | 28 | | | | | 1,450.18 | 73 | 11/20/2007 |
| 89 | 11/26/2007 | Great America | 2580 | 268.88 | 27 | | | 31.12 | 28 | | | | | 300.00 | 73 | 11/26/2007 |
| 90 | 12/1/2007 | GE / HPSC | 2614 | 592.61 | 27 | | | | | | | | | 592.61 | 74 | 11/30/2007 |
| 92 | 12/1/2007 | GE / HPSC | 2615 | 1,663.13 | 27 | | | | | | | | | 1,663.13 | 74 | 11/30/2007 |
| 91 | 12/1/2007 | GE / HPSC | 2616 | 1,290.80 | 27 | | | | | | | | | 1,290.80 | 74 | 11/30/2007 |
| 96 | 12/3/2007 | Great America | 2622 | 288.63 | 27 | | | | | | | | | 288.63 | 76 | 12/6/2007 |
| 97 | 12/3/2007 | Great America | 2623 | 263.50 | 27 | | | | | | | | | 263.50 | 76 | 12/6/2007 |
| 99 | 12/3/2007 | Lfg | | 55.30 | 27 | | | | | | | | | 55.30 | 76 | 12/3/2007 |
| 99 | 12/3/2007 | Mbf Leasing | | 91.14 | 27 | | | | | | | | | 91.14 | 76 | 12/3/2007 |
| 99 | 12/3/2007 | Mbf Leasing | | 91.14 | 27 | | | | | | | | | 91.14 | 76 | 12/3/2007 |
| 95 | 12/5/2007 | IFC Credit Corp. | 2630 | 163.39 | 27 | | | | | | | | | 163.39 | 76 | 12/6/2007 |
| 94 | 12/5/2007 | IFC Credit Corp. | 2631 | 185.97 | 27 | | | | | | | | | 185.97 | 76 | 12/6/2007 |
| 98 | 12/15/2007 | Banc of America | 2654 | 1,075.35 | 27 | 99.80 | 33 | 26.23 | 28 | | | | | 1,201.38 | 78 | 12/18/2007 |
| 100 | 12/16/2007 | Great America | 2660 | 355.12 | 27 | 73.92 | 33 | 31.12 | 28 | | | | | 460.16 | 78 | 12/21/2007 |
| | | | | | | | | | | | | | | | | |
| | | Total Lease Charges: | | 80,247.37 | | | | | | | | | | | | |
| | | Unsubstantiated | | -$2,388.99 | | | | | | | | | | | | |
| | | Total Substantiated: | | $77,858.38 | | | | | | | | | | | | |

[*96]                                    APPENDIX C

| | | | | Interest and Finance Charge Payments in Exhibit 20-P | | | |
|---|---|---|---|---|---|---|---|
| Ex. 20-P page No. | Payee | Check No. | Check amount | Date paid | Interest amount | Date accrued | Ex. 11-P page No. |
| 76 | Advanta | 2297 | $300.00 | 4/2/2007 | $115.86 | 3/29/2007 | 31 |
| 94 | Advanta | 8945 | 707.00 | 8/1/2007 | 302.03 | 7/27/2007 | 32 |
| 101 | Advanta | 9031 | 500.00 | 8/30/2007 | 315.94 | 8/27/2007 | 32 |
| 114 | Advanta | 2504 | 540.00 | 10/30/2007 | 415.84 | 10/29/2007 | 32 |
| 124 | Advanta | 2588 | 1,000.00 | 11/26/2007 | 392.53 | 11/27/2007 | 33 |
| 135 | Advanta | 2672 | 1,000.00 | 12/28/2007 | 431.68 | 12/29/2007 | 33 |
| 28 | American Express | | 2,000.00 | 1/22/2007 | 177.29 | 1/22/2007 | 31 |
| 74 | American Express | 2269 | 426.18 | 3/19/2007 | 267.90 | 3/17/2007 | 31 |
| 80 | American Express | | 500.00 | 4/13/2007 | 1.73 | 4/13/2007 | 31 |
| 82 | American Express | | 500.00 | 5/7/2007 | 165.01 | 5/7/2007 | 31 |
| 83 | American Express | | 500.00 | 5/14/2007 | 97.23 | 5/14/2007 | 31 |
| 86 | American Express | | 1,000.00 | 6/13/2007 | 104.41 | 6/13/2007 | 32 |
| 89 | American Express | | $500.00 | 7/6/2007 | 233.07 | 7/6/2007 | 32 |
| 91 | American Express | | 1,000.00 | 7/13/2007 | 238.80 | 7/13/2007 | 32 |
| 96 | American Express | | 1,000.00 | 8/13/2007 | 299.47 | 8/13/2007 | 32 |
| 102 | American Express | | 500.00 | 9/6/2007 | 189.50 | 9/6/2007 | 32 |
| 104 | American Express | | 1,000.00 | 9/13/2007 | 308.31 | 9/13/2007 | 32 |
| 108 | American Express | | 500.00 | 10/9/2007 | 179.99 | 10/9/2007 | 32 |
| 109 | American Express | 2480 | 319.00 | 10/17/2007 | 305.10 | 10/15/2007 | 32 |
| 118 | American Express | 2550 | 1,589.62 | 11/5/2007 | 177.60 | 11/5/2007 | 32 |
| 121 | American Express | 2571 | 1,000.00 | 11/16/2007 | 182.88 | 11/13/2007 | 32 |
| 128 | American Express | 2633 | 1,000.00 | 12/4/2007 | 184.33 | 12/4/2007 | 33 |
| 130 | American Express | 2653 | 1,000.00 | 12/13/2007 | 214.34 | 12/15/2007 | 33 |
| 88 | American Express | | 5.95 | 7/3/2007 | | | |
| 80 | Banc of America Leasing | | 1,201.38 | 4/16/2007 | 99.81 | 4/16/2007 | 31 |
| 125 | Banc of America Leasing | 2578 | 1,201.38 | 11/20/2007 | 99.80 | 11/15/2007 | 33 |
| 132 | Banc of America Leasing | 2654 | 1,201.38 | 12/18/2007 | 99.80 | 12/15/2007 | 33 |
| 28 | Bank of America | | 5,000.00 | 1/22/2007 | 468.45 | 1/22/2007 | 31 |
| 34 | Bank of America | 2188 | 300.00 | 2/13/2007 | 50.10 | 2/12/2007 | 31 |
| 67 | Bank of America | 2207 | 1,000.00 | 2/26/2007 | 981.68 | 2/18/2007 | 31 |
| 75 | Bank of America | | 1,000.00 | 3/20/2007 | 1,071.85 | 3/20/2007 | 31 |
| 79 | Bank of America | | 300.00 | 4/10/2007 | 197.71 | 4/10/2007 | 31 |

[*97]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 80 | Bank of America | | 500.00 | 4/13/2007 | 678.48 | 4/13/2007 | 31 |
| 81 | Bank of America | | 1,000.00 | 4/20/2007 | 972.23 | 4/20/2007 | 31 |
| 86 | Bank of America | | 1,000.00 | 6/13/2007 | 810.04 | 6/13/2007 | 32 |
| 87 | Bank of America | 1807 | 1,000.00 | 6/19/2007 | 1,041.16 | 6/19/2007 | 32 |
| 93 | Bank of America | 2410 | 1,000.00 | 7/16/2007 | 838.35 | 7/16/2007 | 32 |
| 99 | Bank of America | 2411 | 862.00 | 8/14/2007 | 1,293.69 | 8/13/2007 | 32 |
| 100 | Bank of America | | 1,000.00 | 8/17/2007 | 1,038.89 | 8/17/2007 | 32 |
| 107 | Bank of America | | 1,000.00 | 9/18/2007 | 945.50 | 9/18/2007 | 32 |
| 111 | Bank of America | 2493 | 862.00 | 10/24/2007 | 41.35 | 10/23/2007 | 32 |
| 113 | Bank of America | 2495 | 1,414.41 | 10/24/2007 | 998.20 | 10/23/2007 | 32 |
| 123 | Bank of America | 2581 | 1,367.77 | 11/19/2007 | 998.96 | 11/18/2007 | 33 |
| 85 | Bank of America = Platinum Plus | 6807 | 331.00 | 6/11/2007 | 266.56 | 6/11/2007 | 32 |
| 112 | Bank of America = Platinum Plus | 2494 | 180.00 | 10/24/2007 | 180.00 | 10/23/2007 | 32 |
| 105 | BOUNCED CHECK | | | | | | |
| 131 | Business Card | 2661 | 1,327.80 | 12/18/2007 | 752.33 | 12/18/2007 | 33 |
| 120 | Business Card = Bank of America | 2511 | 862.00 | 11/9/2007 | 41.48 | 11/12/2007 | 32 |
| 129 | Business Card = Bank of America | 2638 | 862.00 | 12/10/2007 | 37.44 | 12/11/2007 | 33 |
| 77 | Business Card = Platinum Plus | 2318 | 230.00 | 4/9/2007 | 206.39 | 4/3/2007 | 31 |
| 116 | Business Card = Platinum Plus | 2507 | 500.00 | 11/1/2007 | 260.99 | 11/2/2007 | 32 |
| 117 | Business Card = Platinum Plus | 2540 | 100.00 | 11/3/2007 | 256.24 | 11/3/2007 | 32 |
| 126 | Business Card = Platinum Plus | 2625 | 500.00 | 12/3/2007 | 206.00 | 12/3/2007 | 33 |
| 3 | Capital One | 2151 | 1,765.26 | 2/12/2007 | 1,036.01 | 2/7/2007 | 30 |
| 5 | Capital One | 2233 | 1,765.26 | 3/6/2007 | 1,036.01 | 3/1/2007 | 30 |
| 8 | Capital One | 2307 | 1,765.26 | 4/12/2007 | 959.59 | 4/2/2007 | 30 |
| 81 | Capital One | | 30.00 | 4/20/2007 | 30.00 | 4/20/2007 | 31 |
| 11 | Capital One | | 1,765.26 | 5/1/2007 | 982.27 | 5/1/2007 | 30 |
| 16 | Capital One | | 1,765.26 | 7/2/2007 | 963.55 | 7/2/2007 | 30 |
| 18 | Capital One | | 1,765.26 | 7/19/2007 | 991.71 | 7/18/2007 | 30 |
| 19 | Capital One | | 1,765.26 | 8/1/2007 | 1,054.97 | 8/1/2007 | 30 |
| 20 | Capital One | | 1,765.26 | 8/31/2007 | 1,019.77 | 8/31/2007 | 30 |
| 110 | Capital One | 2485 | 105.00 | 10/23/2007 | 4.61 | 10/22/2007 | 32 |
| 23 | Capital One | 2530 | 1,765.26 | 11/2/2007 | 894.87 | 11/1/2007 | 30 |
| 122 | Capital One | 2584 | 600.00 | 11/19/2007 | 112.69 | 11/21/2007 | 33 |

[*98]

| 25 | Capital One | 2617 | 1,765.26 | 12/3/2007 | 946.17 | 12/1/2007 | 30 |
|---|---|---|---|---|---|---|---|
| 133 | Capital One | 2658 | 1,000.00 | 12/18/2007 | 71.25 | 12/21/2007 | 33 |
| 1 | Christopher Holden | 2122 | 583.33 | 1/12/2007 | 583.33 | 1/8/2007 | 30 |
| 2 | Commercial Loans Debit | | 309.10 | 2/6/2007 | 309.10 | 2/6/2007 | 30 |
| 7 | Commercial Loans Debit | | 279.18 | 3/6/2007 | 279.18 | 3/6/2007 | 30 |
| 10 | Commercial Loans Debit | | 309.10 | 4/6/2007 | 309.10 | 4/6/2007 | 30 |
| Ex. 5-J at 35 | Commercial Loans Debit | | 299.13 | 5/7/2007 | 299.13 | 5/7/2007 | 30 |
| 15 | Commercial Loans Debit | | 309.09 | 6/6/2007 | 309.09 | 6/6/2007 | 30 |
| 17 | Commercial Loans Debit | | 299.13 | 7/6/2007 | 299.13 | 7/6/2007 | 30 |
| 19 | Commercial Loans Debit | | 309.10 | 8/6/2007 | 309.09 | 8/6/2007 | 30 |
| 21 | Commercial Loans Debit | | 309.09 | 9/6/2007 | 309.09 | 9/6/2007 | 30 |
| 22 | Commercial Loans Debit | | 297.44 | 10/9/2007 | 297.44 | 10/9/2007 | 30 |
| 24 | Commercial Loans Debit | | 711.16 | 11/6/2007 | 298.62 | 11/6/2007 | 30 |
| 26 | Commercial Loans Debit | | 711.16 | 12/6/2007 | 284.15 | 12/6/2007 | 30 |
| 43 | DUPLICATE OF PAGE 10 | | | | | | |
| 44 | DUPLICATE OF PAGE 11 | | | | | | |
| 45 | DUPLICATE OF PAGE 12 | | | | | | |
| 46 | DUPLICATE OF PAGE 13 | | | | | | |
| 47 | DUPLICATE OF PAGE 14 | | | | | | |
| 48 | DUPLICATE OF PAGE 15 | | | | | | |
| 49 | DUPLICATE OF PAGE 16 | | | | | | |
| 50a | DUPLICATE OF PAGE 17 | | | | | | |
| 50b | DUPLICATE OF PAGE 18 | | | | | | |
| 51 | DUPLICATE OF PAGE 19 | | | | | | |
| 35 | DUPLICATE OF PAGE 2 | | | | | | |
| 52 | DUPLICATE OF PAGE 20 | | | | | | |
| 53 | DUPLICATE OF PAGE 21 | | | | | | |
| 54 | DUPLICATE OF PAGE 22 | | | | | | |
| 55 | DUPLICATE OF PAGE 23 | | | | | | |
| 56 | DUPLICATE OF PAGE 24 | | | | | | |
| 57 | DUPLICATE OF PAGE 25 | | | | | | |
| 58 | DUPLICATE OF PAGE 26 | | | | | | |

[*99]

| 59 | DUPLICATE OF PAGE 27 | | | | | | |
|---|---|---|---|---|---|---|---|
| 60 | DUPLICATE OF PAGE 28 | | | | | | |
| 61 | DUPLICATE OF PAGE 29 | | | | | | |
| 36 | DUPLICATE OF PAGE 3 | | | | | | |
| 62 | DUPLICATE OF PAGE 30 | | | | | | |
| 63 | DUPLICATE OF PAGE 31 | | | | | | |
| 64 | DUPLICATE OF PAGE 32 | | | | | | |
| 65 | DUPLICATE OF PAGE 33 | | | | | | |
| 66 | DUPLICATE OF PAGE 34 | | | | | | |
| 37 | DUPLICATE OF PAGE 4 | | | | | | |
| 38 | DUPLICATE OF PAGE 5 | | | | | | |
| 39 | DUPLICATE OF PAGE 6 | | | | | | |
| 40 | DUPLICATE OF PAGE 7 | | | | | | |
| 41 | DUPLICATE OF PAGE 8 | | | | | | |
| 42 | DUPLICATE OF PAGE 9 | | | | | | |
| 68 | GE Healthcare Financial Services | 2236 | 2,751.10 | 3/6/2007 | 242.49 | 3/1/2007 | 31 |
| 69 | GE Healthcare Financial Services | 2237 | 544.01 | 3/6/2007 | 50.40 | 3/1/2007 | 31 |
| 70 | GE Healthcare Financial Services | 2235 | 1,082.66 | 3/6/2007 | 99.63 | 3/1/2007 | 31 |
| 73 | Great America Leasing Corp | 2267 | 380.08 | 3/16/2007 | 36.96 | 3/16/2007 | 31 |
| 80 | Great America Leasing Corp. | | 380.08 | 4/16/2007 | 36.96 | 4/16/2007 | 31 |
| 92 | Great America Leasing Corp | 8933 | 417.04 | 7/16/2007 | 73.92 | 7/16/2007 | 32 |
| 134 | Great America Leasing Corp | 2660 | 460.16 | 12/21/2007 | 73.92 | 12/16/2007 | 33 |
| 10 | Great America Leasing Corp. | | 288.63 | 4/6/2007 | | | |
| 13 | Great America Leasing Corp. | | 299.13 | 5/7/2007 | | | |
| 30 | HPSC | 2147 | 2,747.51 | 2/13/2007 | 238.90 | 2/7/2007 | 31 |
| 31 | HPSC | 2149 | 1,071.43 | 2/13/2007 | 88.40 | 2/7/2007 | 31 |
| 32 | HPSC | 2148 | 653.38 | 2/13/2007 | 60.77 | 2/7/2007 | 31 |
| 4 | Jane Garcia | 2181 | 208.33 | 2/9/2007 | 208.33 | 2/9/2007 | 30 |

**[*100]**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6 | Jane Garcia | 2241 | 208.33 | 3/5/2007 | 208.33 | 3/5/2007 | 30 |
| 9 | Jane Garcia | 2305 | 166.67 | 4/4/2007 | 166.67 | 4/6/2007 | 30 |
| 12 | Jane Garcia | 2363 | 1,000.00 | 5/7/2007 | 1,000.00 | 5/4/2007 | 30 |
| 14 | Jane Garcia | 2383 | 1,000.00 | 6/7/2007 | 1,000.00 | 6/5/2007 | 30 |
| 84 | Jane Garcia | 2391 | 10,000.00 | 6/8/2007 | 14.74 | 6/8/2007 | 31 |
| 33 | Marlin Leasing | 2184 | 1,416.93 | 2/16/2007 | 193.91 | 2/9/2007 | 31 |
| 71 | Marlin Leasing | 2256 | 1,586.83 | 3/12/2007 | 193.91 | 3/8/2007 | 31 |
| 90 | Marlin Leasing | 8919 | 253.22 | 7/13/2007 | 253.22 | 7/10/2007 | 32 |
| 98 | Marlin Leasing | 8991 | 1,452.23 | 8/16/2007 | 193.91 | 8/10/2007 | 32 |
| 103 | Marlin Leasing | 8990 | 1,452.23 | 9/12/2007 | 193.91 | 9/10/2007 | 32 |
| 119 | Marlin Leasing | 2554 | 1,646.14 | 11/9/2007 | 193.91 | 11/10/2007 | 32 |
| 127 | Marlin Leasing | 2619 | 3,128.27 | 12/4/2007 | 200.38 | 12/4/2007 | 33 |
| 106 | McKesson Medical | 9094 | 979.73 | 9/20/2007 | 979.73 | 9/17/2007 | 32 |
| 115 | McKesson Medical | 2510 | 2,036.19 | 11/2/2007 | 78.70 | 11/1/2007 | 32 |
| 27 | Platinum Plus | | 1,000.00 | 1/9/2007 | 255.32 | 1/5/2007 | 31 |
| 29 | Platinum Plus | | 500.00 | 2/13/2007 | 228.67 | 2/5/2007 | 31 |
| 72 | Platinum Plus | | 462.00 | 3/15/2007 | 281.25 | 3/15/2007 | 31 |
| 88 | Platinum Plus | | 813.01 | 7/3/2007 | 278.93 | 7/3/2007 | 32 |
| 95 | Platinum Plus | | 500.00 | 8/3/2007 | 217.89 | 8/3/2007 | 32 |
| 78 | Popular Leasing | 2324 | 3,178.39 | 4/9/2007 | 138.60 | 4/6/2007 | 31 |
| 97 | Popular Leasing | 8966 | 3,178.39 | 8/8/2007 | 138.60 | 8/7/2007 | 32 |

| Items on P&L Missing from Ex. 20-P | | | | | | |
|---|---|---|---|---|---|---|
| Subcategory | Date accrued | Payee | Amount | Check No. | Ex. 5-P page No. | Date posted |
| Loan interest | 1/2/2007 | Capital One | $1,010.21 | 8536 | | |
| Loan interest | 10/1/2007 | Capital One | 940.22 | 9118 | | |
| Finance charge | 1/21/2007 | Advanta | 75.07 | 5584 | | |
| Finance charge | 1/26/2007 | GE / HPSC | 99.00 | Dir Debit | 9 | 1/26/2007 |
| Finance charge | 2/15/2007 | Banc of America Leasing | 35.02 | 2201 | 20 | 3/5/2007 |
| Finance charge | 2/15/2007 | Banc of America Leasing | 35.02 | 2201 | 20 | 3/5/2007 |
| Finance charge | 2/27/2007 | Advanta | 62.40 | 2225 | 20 | 3/5/2007 |
| Finance charge | 2/28/2007 | Popular Leasing | 289.93 | 2228 | 20 | 3/5/2007 |
| Finance charge | 4/6/2007 | Popular Leasing | 138.60 | 2324 | 29 | 4/9/2007 |
| Finance charge | 5/9/2007 | Bank of America | 735.79 | 2367 | 36 | 5/11/2007 |
| Finance charge | 5/18/2007 | Advanta | 328.66 | 8823 | | |

[*101]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Finance charge | 5/22/2007 | Platinum Plus | 490.29 | 2374 | 38 | 5/23/2007 |
| Finance charge | 6/5/2007 | American Express | 183.55 | 8844 | | |
| Finance charge | 6/8/2007 | Marlin Leasing | 193.91 | 8861 | 43 | 6/13/2007 |
| Finance charge | 6/29/2007 | Advanta | 296.25 | 8884 | 48 | 7/5/2007 |
| Finance charge | 7/18/2007 | Bank of America | 1,011.96 | 8871 | | |
| Finance charge | 8/6/2007 | American Express | 175.05 | Dir Debit | 54 | 8/6/2007 |
| Finance charge | 9/14/2007 | Great America Leasing | 36.96 | 9105 | 61 | 9/24/2007 |
| Finance charge | 9/28/2007 | Advanta | 949.03 | 9117 | 64 | 10/2/2007 |
| Finance charge | 10/3/2007 | Platinum Plus | 609.07 | 9060 | | |
| Finance charge | 10/10/2007 | Marlin Leasing | 193.91 | 9145 | | |
| Finance charge | 10/12/2007 | Bank of America | 43.37 | 9146 | | |
| Finance charge | 11/29/2007 | Pharma Pac | 26.46 | 2577 | | |

| Marlin Leasing Finance Charges Ex. 14-P | | | | | | |
|---|---|---|---|---|---|---|
| Ex. 14-P page No. | Date posted | Check No. | Ex. 5-J page No. | Date posted | Check amount | Finance charge amount |
| 19 | 3/12/2007 | 2256 | 21 | 3/12/2007 | $1,586.83 | $193.91 |
| 19 | 6/14/2007 | 8861 | 43 | 6/13/2007 | 1,705.45 | 193.91 |
| 19 | 7/16/2007 | 8918 | 49 | 7/13/2007 | 253.22 | 193.91 |
| 20 | 7/30/2007 | | | | | 193.91 |
| 20-21 | 11/9/2007 | 2554 | 71 | 11/9/2007 | 1,646.14 | 193.91 |
| 21 | 12/5/2007 | 2619 | 76 | 12/4/2007 | 3,128.27 | 193.91 |
| TOTAL | | | | | | 1,163.46 |
| | | | | | | |

[*102]                              APPENDIX D

| Marlin Leasing Payments in Exhibit 14-J | | | | | | |
|---|---|---|---|---|---|---|
| Ex. 14-P page No. | Date posted | Check No. | Ex. 5-J page No. | Date posted | Check amount | "Lease" charge amount |
| 19 | 1/2/2007 | Cash | N/A | N/A | $2,860.83 | $2,586.46 |
| 19 | 2/15/2007 | 2184 | 15 | 2/16/2007 | 1,416.93 | 1,292.73 |
| 19 | 3/12/2007 | 2256 | 21 | 3/12/2007 | 1,586.83 | 1,292.73 |
| 19 | 4/10/2007 | 62950177 | 29 | 4/10/2007 | 1,392.92 | 1,292.73 |
| 19 | 5/16/2007 | 8667 | 36 | 5/16/2007 | 1,392.92 | 1,292.73 |
| 19 | 6/14/2007 | 8861 | 43 | 6/13/2007 | 1,705.45 | 1,292.73 |
| 20 | 7/16/2007 | 8668 | 49 | 7/16/2007 | 1,392.92 | 1,292.73 |
| 20 | 8/20/2007 | 8991 | 55 | 8/16/2007 | 1,452.23 | 1,292.73 |
| 20 | 9/13/2007 | 8990 | 60 | 9/12/2007 | 1,452.23 | 1,292.73 |
| 20-21 | 11/9/2007 | 2554 | 71 | 11/9/2007 | 1,646.14 | 1,292.73 |
| | | | | | | |
| 21 | 12/5/2007 | 2619 | 76 | 12/4/2007 | 3,128.27 | 2,585.46 |
| TOTAL | | | | | | 16,806.49 |

| Payments to Key Equipment Finance | | | |
|---|---|---|---|
| Ex. 5-J page No. | Date posted | Amount | Note |
| 2 | 1/2/2007 | $2,881.42 | Leasing Services - DES |
| 21 | 3/12/2007 | 1,378.21 | Check No. only - does not specify Key |
| 29 | 4/9/2007 | 1,378.21 | Check No. only - does not specify Key |
| 35 | 5/4/2007 | 1,378.21 | |
| 42 | 6/7/2007 | 1,378.21 | |
| 47 | 7/3/2007 | 1,378.21 | Check No. only - does not specify Key |
| 53 | 8/2/2007 | 1,378.21 | Check No. only - does not specify Key |
| 59 | 9/4/2007 | 1,378.21 | Check No. only - does not specify Key |
| 65 | 10/9/2007 | 1,378.21 | Check No. only - does not specify Key |
| 70 | 11/5/2007 | 1,378.21 | Check No. only - does not specify Key |
| 76 | 12/5/2007 | 1,378.21 | Check No. only - does not specify Key |
| TOTAL | | 16,663.52 | |